## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ALSIP ACQUISITION, LLC., et al.,[1] | ) | Case No. 14-12596 (      ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| _____ | ) | |

### DECLARATION OF STEPHEN L. SILVER
### IN SUPPORT OF FIRST DAY RELIEF

I, Stephen L. Silver, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am the president of Alsip Acquisition, LLC ("Alsip") and APCA, LLC ("APCA"; and together with Alsip, the "Debtors").

2.      I submit this declaration (the "Declaration") in support of the Debtors' petition and "first day" motions and applications described in Part II below (collectively, the "First Day Motions"). Except as otherwise indicated, all statement in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees and professionals at my direction, or my opinion based on my experience with the Debtors' operations and financial condition. In making my statements, based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees and professionals, I have relied upon the assumption that such employees and professionals accurately record, prepare, and collect any such documentation and other information. If I were

---

[1]    The Debtors in these proceedings and the last four digits of the Debtors' federal taxpayer identification numbers are as follows: Alsip Acquisition, LLC (Tax ID No. XX-XXX4908), and APCA, LLC (Tax ID No. XX-XXX3005).

called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

3.     Part I of this Declaration describes the business of the Debtors and the developments that led to the Debtors filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), which petitions were filed on November 20, 2014 (the "Petition Date"). Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith in support of the Debtors' Chapter 11 Cases (the "Bankruptcy Cases" or the "Cases").

## PART I

### Overview of the Debtors and their Operations

4.     There are two Debtors in these Cases. Alsip was the operating entity and is the owner of all of the assets discussed herein. APCA was formed as a wholly owned subsidiary of FutureMark Holdings, LLC in 2009, however, APCA never acquired any assets. APCA's only liability is that it is jointly obligated with Alsip on the loan in favor of Wells Fargo Bank, N.A. (the "Lender"), discussed more fully herein. The term "Debtors" is used throughout this Declaration and the First Day Motions since the Debtors have filed a motion for joint administration of their Cases, however, Alsip was the operating entity.

5.     Prior to the Idle Date (as defined below), the Debtors were the leading North American provider of responsibly made recycled paper for books and magazines, as well as for commercial printing and packaging applications. The Debtors' operational and manufacturing headquarters are located in Alsip, Illinois, and consist of a mill located at 13101 South Pulaski Road, Alsip, Illinois 60803 (the "Mill") and a warehouse located at 13060 South Crawford

Avenue, Alsip, Illinois 60803 (the "Warehouse"). The Debtors lease the Warehouse, as well as facilities in Connecticut and New Jersey. The Debtors intend to vacate each of these facilities during these Bankruptcy Cases.

6.      At its height, Alsip employed 116 hourly workers and 54 salaried personnel. The hourly workers were represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its affiliated Local 1085 (collectively, the "USW"). Four employees (boiler engineers), who are no longer employed by the Debtors, were represented by International Union of Operating Engineers and its affiliated Local 399 (the "IBUE", and together with USW, the "Unions"). In the APA (as defined below), the proposed Buyer (as defined below) has agreed that after Closing, should (i) the Buyer wish to hire employees for the plant and (ii) a majority of the representative complement of the employees being considered to work at the plant comes from the Unions' bargaining unit, Buyer will recognize the Unions as the bargaining representatives for such employees and will negotiate with the Union the terms and conditions of a new bargaining agreement.

7.      Following the Idle Date, the Debtors reduced their workforce. As of the Petition Date, the Debtors employed a scaled-back staff of 11 hourly workers and 13 salaried workers that are charged with a wide variety of functions critical to the administration of these Bankruptcy Cases, including management of the Debtors, liquidating the Debtors' remaining inventory and preserving the Debtors' assets that are the subject of the contemplated sale in these Cases.

8.      The goal of the Debtors in these Bankruptcy Cases is to sell certain real estate and equipment to the Buyer or another bidder submitting a higher and better offer pursuant a court-

approved and supervised process. While the Buyer has not made any representations that it will open the facilities after the proposed sale, the hope is that this will occur so that the Debtors' former and current employees have the opportunity to seek or continue employment.

**Corporate Structure and Management**

9.      Alsip is a Delaware limited liability company.   90.75% of the membership interests of Alsip are owned by FutureMark Holdings, LLC ("FutureMark"), with the remaining membership interests held by certain current and former employees of Alsip.  APCA is a Delaware limited liability with 100% of its membership interests held by FutureMark.  The sole member of FutureMark is Watermill-Alsip Partners, L.P., whole general partner is Watermark-Alsip Enterprises, LLC.  I am also the president of APCA.

10.      Management of the Debtors consists of myself as the Debtors' president and chief executive officer and Joseph Ostmann as vice president of finance.

**Capital Structure**

11.      As of the October 31, 2014, the Debtors had approximately $7,742,972.39 of funded indebtedness and related obligations outstanding, pursuant to the Credit and Security Agreement dated as of April 16, 2010 (as amended, modified, supplemented or restated and in effect from time to time, collectively the "Pre-Petition Credit Agreement") with the Lender.

12.      The Pre-Petition Credit Agreement provided the Debtors with a term loan (the "Term Loan") and a revolving credit facility (the "Revolver" and together with the Term Loan, the "Prepetition Secured Facilities") subject to the terms and conditions set forth therein. The Prepetition Secured Facilities were set to mature on April 14, 2013, subject to certain extensions allowed by its terms.  The obligations arising under the Prepetition Secured Facilities are secured by liens on substantially all of the Debtors' assets.

13.     The Pre-Petition Credit Agreement has been amended several times since it originally closed.  On November 29, 2011, recognizing a need for relief from certain defaults under the Pre-Petition Credit Agreement, the Debtors entered into a waiver and tenth amendment thereto (the "Tenth Amendment") to provide for the following terms and conditions, among others:[2]

 a. a one-time waiver of defaults in respect to compliance with the minimum EBITDA covenant, and maximum Debt to Book Net Worth ratio;

 b. increasing availability under the Prepetition Secured Facilities from $15 million to $17 million;

 c. extending the maturity from April, 14, 2013 to April 14, 2014;

 d. increasing the Applicable Margins; and

 e. requiring a limited guaranty for the repayment of the Prepetition Secured Facilities.

14.     Obligations arising under the Prepetition Secured Facilities are guaranteed on a limited basis by Watermark-Alsip Enterprises, LLC (the "Guarantor"), which limited guaranty is secured by a cash collateral account in the amount of $2,250,000 held by the Lender.

15.     On September 5, 2014, in the face of additional defaults under the Pre-Petition Credit Agreement, the Debtors entered into a certain forbearance agreement (as amended, the "Forbearance Agreement") with the Lender.  The Forbearance Agreement was premised in large part on the fact that the Debtors had commenced a marketing process for the sale of the business and/or assets, and that during such marketing process and thereafter, the Debtors would implement an orderly wind-down plan pending consummation of the sale.  The Forbearance Agreement, which was extended by several amendments terminated on November 14, 2014.

---

[2] Capitalized terms used in the following (a)-(e) have the meaning given to them in the Tenth

## History of the Debtors and Events Leading Up To Chapter 11

16.     The Mill operated by the Debtors was built in 1968 to recycle newsprint paper. At that time, the principal goal of recycling paper was to save money, rather than to protect the environment.  In 2000, the Mill was purchased by the Myllykoski Corporation, a European paper company primarily located in Finland, Germany and Switzerland, and operated as Myllykoski North America Inc. ("Myllykoski").  Myllykoski invested more than $200 million in the facility to convert from newsprint to high end publication papers.  Following this conversion, the Mill reopened in 2002 making recycled coated paper for magazines and catalogs.

17.     Under Myllykoski's brand, the Mill was the only mill in North America making recycled coated paper, yet this feature was not emphasized as recycled papers was commonly viewed at that time as inferior to new paper.  After a decade of unprofitability, Myllykoski marketed the Mill for sale.

18.     In 2009, the facility was acquired by its current ownership group.  Alsip's strategic vision was that, as corporate America became more focused on environmental issues, recycled paper could be transformed from a negative to a positive and used to market the paper produced at the Mill.  Accordingly, Alsip marketed the paper produced at the Mill to Fortune 500 users of coated paper by emphasizing the environmental benefits of recycled paper.

19.     This new marketing strategy proved successful and within the first six months of Alsip's acquisition of the Mill, approximately fifty new accounts were recruited, most of which were major Fortune 500 companies with public sustainability missions.  Alsip added to this success by introducing five new products based on its higher-margin recycled printing paper.

---

Amendment.

These new products, many of which had never been achieved before with recycled paper, included coated paper for school textbooks as well as for high speed digital printers.

20.     Notwithstanding these successes, however, the overall market for coated paper was declining as digital advertising cannibalized print advertising.   This market decline accelerated after the launch of the initial iPad® in May 2010.   While Alsip was able to outperform its competitors to a degree with moderately higher prices by emphasizing that its paper was recycled, margins rapidly declined as production capacity in the industry started to exceed demand.

21.     One development that had a particularly negative impact on Alsip was that in late 2012, a large bankrupt mill in Canada that had been shut down a year earlier reopened.   In addition, the province of Nova Scotia provided approximately $150,000,000 in subsidies and grants to the new owners of this mill.   The effect of the Canadian mill reopening was that the United States paper market was flooded with low cost paper.   By early 2014, all coated paper pricing fell approximately 15%, making Alsip (as well as most of its competitors) unprofitable. The losses at this time were further magnified by the record cold winter of 2014, which caused an unexpected spike in Alsip's energy costs of approximately $4,000,000.

22.     Despite these losses, Alsip believed that it could survive as a viable entity.   This hope was buttressed by an announcement in January 2014 that the two largest North American coated paper manufacturers would merge.   Since both companies were heavily-leveraged and operating at a loss, it was anticipated that the merger would result in mill shutdowns and output reductions.   Based on a belief that the market for coated paper was turning upward, a group of investors invested additional funds in Alsip and the Lender agreed to increase the size of its loan by an additional $3,000,000 in early 2014.

23.    With this increased liquidity, Alsip believed that it would be able to continue operating until the above-referenced merger closed – which was expected to occur in August 2014.  However, in April 2014, the Mill encountered several severe production issues which resulted in a large operating loss of $1,700,000.  Once the extent of the loss was known in early May, the following steps were taken: (i) investors and the Lender were notified that Alsip's cash position had been largely exhausted; (ii) Alsip hired Development Specialists, Inc. ("DSI") as its financial restructuring experts; (iii) Alsip engaged Sanabe & Associates ("Sanabe") as its investment banker to pursue a buyer or other strategic transaction; and (iv) efforts were made to lower costs in order to slow the cash burn of the company in hopes that a more favorable environment would emerge.

24.    Over the next few months, the Debtors attempted to cut expenses in hopes of remaining an ongoing business.  To that end, the Debtors were able to reach agreement with both the USW and IBUE to reduce wages by 10% and give up certain benefits.  Still, the company was not able to generate a profit.  The month of July turned out to be far worse than could have been anticipated and large cash losses, due primarily to production problems coupled with no relief on prices.  The problems continued into August.  In July and August, Sanabe and the Debtors worked with a number of potential buyers to try to sell the business as a going business.  Unfortunately, none of the potential buyers could progress toward a sale in the necessary time frame.  The company was facing a precipitous diminishment of working capital and, given the circumstances, no source of further funding was available.  WARN notices were given to employees and on August 21, 2014, and the company announced that the Mill would close.  This period provided customers two-weeks' notice to find new suppliers and was designed to preserve

goodwill and maximize sales of remaining inventory and collection of accounts receivable. The Mill and Warehouse were idled on September 5, 2014 (the "Idle Date").

**The Pre-Petition Sale Efforts and the Stalking Horse**

25.     At the same time that the Debtors were attempting to keep their businesses as a going-concern, Sanabe, as the Debtors' investment banker, marketed the Debtors' real estate and equipment for sale. Sanabe is an investment banking boutique providing M&A, restructuring, merchant banking and strategic and financial advice to the North American building products, paper and packaging and renewable energy industries, with particular experience marketing distressed paper mills. In order to ensure that the Debtors maximized the value received for their assets, Sanabe prepared marketing materials and contacted more than sixty (60) potential purchasers, including:

> ➢ Groups willing to continue the manufacture of coated paper or de-inked pulp;
>
> ➢ Groups interested in converting the Mill's production to the manufacturing of packaging grade paper;
>
> ➢ Groups interested in converting the Mill's production to the manufacture of tissue grade paper; and
>
> ➢ Parties interested in liquidating the Debtors' business.

The vast majority of the groups that Sanabe contacted as part of this initial stage were interested in continuing or modifying the Debtors' manufacturing facilities (i.e., the first three groups above). As part of this effort, Sanabe created and circulated (upon the execution of a confidentiality agreement) different offering memoranda for parties interested in the various strategies outlined above that included an executive summary, detailed equipment/asset lists, various environmental studies and both equipment and real estate appraisals.

26.     Of the initial parties that were contacted, twelve (12) visited the Debtors' facility for management presentations and/or conducting additional due diligence.  Of the parties that visited the Debtors' facilities, at least one was interested in each of the four categories identified in the foregoing paragraph.

27.     Following these site visits, nine (9) parties submitted non-binding first-round bids ranging from $2.4 million to $10 million.  Sanabe, the Debtors, and the Debtors' legal and restructuring advisors reviewed these bids and invited seven (7) bidders to participate in the second round of the sale process.

28.     From this process, two (2) potential purchasers emerged, and the Debtors (and their professionals) worked with these two companies over the next months to refine their offers.  Ultimately, Resolute FP Illinois LLC (the "Buyer") was chosen by the Debtors (and their professionals) as having submitted the highest and best bid for the purchase of the Debtors' assets (the "Assets").  The Buyer's offer was selected, in part, because of its ability to successfully consummate the contemplated transaction.  According, the Buyer and the Debtors negotiated an asset purchase agreement (the "APA") to document the sale of certain real estate and equipment of the Debtors, subject to higher and better offers pursuant to the Bid Procedures (as defined below).

**Chapter 11 Goals**

29.     On November 20, 2014, the Debtors filed these Bankruptcy Cases.  The goal of the Debtors is to consummate the sale contemplated by the APA to the Buyer or another bidder pursuant to the Bid Procedures.  In addition, the Debtors intend to vacate their leased locations in Connecticut and New Jersey, liquidate their other assets, and distribute any proceeds pursuant to the claims process established by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure

and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware. The Debtors are requesting that the motion seeking approval of the Bid Procedures be heard on or before December 4, 2014 and that the Court schedule the auction and sale hearing on December 22nd and 23rd, respectively. This requested schedule will permit the sale to close before December 24, 2014, which is the last day of the proposed budget for the DIP Facility (as defined below). Termination or expiration of the DIP Facility allows the Buyer to terminate the APA.

### Part II – First Day Motions and Applications

### Relief Sought in the Debtors' First Day Motions

30.    Contemporaneously herewith, the Debtors have filed a number of First Day Motions[3/] in these Chapter 11 Cases seeking orders granting various forms of relief intended to facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift and smooth sale of the Assets. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

**I.    Administrative and Procedural Pleadings**

**A.    Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("Joint Administration Motion")**

31.    Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing the joint administration of these cases, for procedural purposes only. The Debtors believe that many, if not most, of the motions, applications, and other pleadings filed in these Chapter 11 Cases will relate to relief sought jointly by the Debtors. For example, virtually all of the relief sought by the Debtors in the First Day Pleadings is sought on behalf of both Debtors. Joint administration of the Debtors' Chapter 11 Cases, for procedural purposes only, under a

single docket entry, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of two independent Chapter 11 Cases.

32.    I believe that: (i) the relief requested in the Joint Administration Motion will provide significant administrative convenience without harming the substantive rights of any party in interest; (ii) many of the motions, hearings, and orders in these Chapter 11 Cases will affect both Debtors; (iii) the entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections; (iv) joint administration will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency; (v) joint administration will not adversely affect the Debtors' respective constituencies because this Motion seeks only administrative, not substantive, consolidation of the Debtors' estates; and (vi) parties in interest will not be harmed by the relief requested, but rather will benefit from the cost reductions associated with the joint administration of these Chapter 11 Cases.

33.    Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.    Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor ("Creditor Matrix Motion")**

34.    Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtors.  The Debtors propose to retain Epiq Bankruptcy Solutions LLC ("Epiq") as notice and claims agent in connection with the Debtors' Chapter 11 Cases to

---

3/    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

assist the Debtors in preparing creditor lists and mailing initial notices. With such assistance, the Debtors will be prepared to file a computer-readable, consolidated list of creditors upon request and will be capable of undertaking all necessary mailings.

35.     I believe that consolidation of the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit Epiq to promptly notice those parties. Maintaining electronic-format lists of creditors rather than preparing and filing separate matrices will maximize efficiency and reduce costs. Moreover, one of the Debtors in this case, APCA, has no assets. APCA's only creditor is the Lender, a liability on which APCA is jointly obligated with Alsip, the other Debtor in these Chapter 11 Cases.

36.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Creditor Matrix Motion should be granted

**C.      Debtors' Application for Entry of an Order Approving the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Administrative Advisor for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date (the "Notice and Claims Agent Application")**

37.     Pursuant to the Notice and Claims Agent Application, the Debtors are seeking authority to retain Epiq as their Claims and Noticing Agent. The Debtors have evaluated several potential candidates to serve as their Claims and Noticing Agent. Following that review, and in consideration of the number of anticipated claimants and parties in interest, the nature of the Debtors' business, and the scope of tasks for which the Debtors will require the assistance of a Claims and Noticing Agent, the Debtors submit that the appointment of Epiq as Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates.

38.     Based on the advice of the Debtors' advisors and Epiq's representation that it has extensive experience with similarly sized debtors in chapter 11, I believe that Epiq is qualified to serve as Claims and Noticing Agent in these Chapter 11 Cases. A detailed description of the

services that Epiq has agreed to render and the compensation and other terms of the engagement are provided in the Notice and Claims Agent Application. I have reviewed the terms of the engagement.

39.    I believe that the relief requested in the Notice and Claims Agent Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will ease the Debtors' filing of these Chapter 11 Cases and the first, necessary actions of these cases.

40.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Notice and Claims Agent Application should be granted.

## II.    Operational Motions Requesting Immediate Relief

### A.    Debtors' Motion for Entry of Order (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System; (B) Honor Certain Prepetition Obligations Related Thereto; (C) Maintain Existing Business Forms; and (II) Granting Related Relief ("Cash Management Motion")

41.    The Debtors' existing Cash Management System is comprised of three bank accounts, each of which is identified on Exhibit 2 annexed to Exhibit A to the Cash Management Motion (collectively, the "Bank Accounts"), and each of which reside with the Lender. The Debtors have used this Cash Management System for approximately four years.

42.    Most funds received by the Debtors are in the form of checks, and are received through the Automated Clearing House (ACH) Payment system, or by way of wire transfers. In most cases, these funds are delivered directly into a lockbox account (the "Cash Collateral Account") maintained by the Lender. When checks are sent by customers to the Debtors (rather than directly to the Cash Collateral Account), the Debtors electronically deposit those checks into the Cash Collateral Account by using a scanning device. The Lender sweeps all amounts in the Cash Collateral Account on a daily basis and applies such amount to the Debtors' outstanding revolver balance.

43.    The Debtors are able to make payments by using the Lender's Commercial Electronic Office ("CEO") portal.  Specifically, the Debtors maintain two accounts for their disbursements, an operating account (the "Operating Account") which is used primarily for wire transfers for general operational purposes, and an accounts payable account (the "Accounts Payable Account") from which the Debtors make check transfers and wire transfers for certain payments, including the Debtors' payroll.  In each instance, payments from these accounts are reconciled each day so that the amounts drawn upon by the Debtors are debited to the Debtors' outstanding revolver balance.

44.    The Cash Management System is comparable to that used by similarly situated companies to manage cash in a cost-effective and efficient manner.  The existing Cash Management System permits the Debtors to efficiently collect, transfer and disburse funds.  It also permits the Debtors to monitor what they have spent, creates forecasts of future spending and expected revenues, and produces certain financial reports.  The Debtors' financial personnel, in particular Patricia Polacek, the Debtors' Controller, are very familiar with the Cash Management System.  Allowing the Debtors to continue to use their current system will avoid any unnecessary expense associated with training such personnel on a different system.

### a. Bank Accounts

45.    The Bank Accounts are described in the following table:

| Category | Description |
| --- | --- |
| Cash Collateral – 8393 | Customer receipts are deposited into the Cash Collateral Account. The funds held in the Cash Collateral Account are swept by the Lender on a daily basis, which amount is credited against the Debtors' outstanding revolver amount. |
| Operating – 8377 | The Debtors maintain an Operating Account to pay vendors, service providers, and other trade parties on an as-needed basis. Amounts drawn from the Operating Account are debited against the Debtors' outstanding revolver amount. |
| Accounts Payable – 8385 | The Debtors maintain an Accounts Payable Account from which the Debtors make certain operational payments, including payroll. ADP debits the amount needed to fund payroll from this account. The daily balance in this account is swept by the Lender to the Operating Account. |

46.    The Debtors pay the Lender approximately $4,000 per month on account of fees incurred in connection with the Bank Accounts and the CEO portal (the "Bank Fees"). The Debtors pay this amount on approximately the 10th day of each month, for the Bank Fees incurred in the prior month

### b. The Lender is in Compliance with the U.S. Trustee Guidelines

47.    The Debtors have been informed by the Lender that it is designated as an authorized depositary by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), pursuant to the Operating Guidelines and Reporting Requirements for Debtor in Possession and Trustees (the "U.S. Trustee Guidelines").

### c. Business Forms

48.    As part of the Cash Management System, the Debtors utilize numerous preprinted business forms (the "Business Forms") in the ordinary course of its business. The Debtors also maintain books and records to document, among other things, their profits and expenses. Allowing the Debtors to continue to use all correspondence and business forms (including,

without limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines, will minimize expenses to the estate and avoid confusion on the part of employees, customers, and other parties during the pendency of these Chapter 11 Cases.

49.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

**B.      Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses; and (B) Continue Employee Benefits Programs; And (II) Granting Related Relief ("Wages Motion")**

50.     Prior to the Idle Date, the Debtors had approximately 170 employees. Most of these employees were laid off at the time the Debtors' facilities were idled on September 5, 2014 and are no longer on the Debtors' payroll. As of the Petition Date, the Debtors employ a scaled-back staff of 11 hourly workers and 13 salaried workers (collectively, the "Employees") that are charged with a wide variety of functions critical to the administration of these Chapter 11 Cases, including management of the Debtors, liquidating the Debtors' remaining inventory and preserving the Debtors' assets that are the subject of the contemplated sale in this case. Most of these employees receive modest compensation and their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to the Debtors' stated goals in these cases. Eleven of the Debtors' remaining employees (i.e., the hourly employees) are represented by the USW. In addition, prior to the Idle Date, the Debtors had four employees represented by the IBUE, however, those four employees are no longer employed by the Debtors.

51.    The vast majority of the Debtors' employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Upon information and belief, those employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their employees compensation, provide them with benefits, and maintain the other programs identified in this Motion.

52.    The below chart lists the programs and expenses that the Debtors seek authority to honor as they did prepetition pursuant to the Wages Motion:

| Relief Sought[4] | Amount |
|---|---|
| **Employee Compensation and Withholding Obligations** | |
| Unpaid Wages (Gross) (excluding EE taxes which are noted below) | $30,114.77 |
| Unpaid Sales Commission | 0.00 |
| Withholding Obligations (Union Dues) | $475.00 |
| Unpaid Payroll Fees (ADP) | $600.32 |
| Payroll Taxes (EE 9,070.11 ER $2,746.44) | $12,543.17 |
| Expense Reimbursements | $5,000.00 |
| **Employee Benefit Programs** | |
| Health Insurance Programs (Dental only (health is prepaid for November) | $0.00 |
| Life & AD&D Insurance (all amounts have been prepaid) | $0.00 |
| Voluntary Life & AD&D Insurance (all amounts have been prepaid) | $0.00 |
| Disability Benefits (all amounts have been prepaid) | $0.00 |
| Workers' Compensation Programs | $0.00 |
| Vision (Union Employees Only) | $0.00 |
| Flexible Benefit | $0.00 |
| Long Term Care | $695.02 |
| **Total** | **$49,428.28** |

53.    In the ordinary course of business, the Debtors pay Employees wages, salaries, and other compensation (collectively, the "Employee Compensation").  The Debtors pay their Employees' wage and salary obligations (the "Wages") on either a salaried or hourly basis. Employees that are paid on an hourly basis are paid weekly.  Employees that are paid on a

---

4    Capitalized terms in this chart shall have the meanings as ascribed to them in this Motion.

salaried basis have traditionally been paid on the 15th and 30th of each month, however, beginning on the week of November 17, 2014, the Debtors started to pay these Employees weekly. Because the Employees are paid in arrears, they will be owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date because of, among other things: (a) potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees; and (b) the delay between the date when some payroll checks are issued and the date when such checks are presented to an Employee's bank for payment.

54.    As of the Petition Date, the Debtors estimate that Employees are owed an aggregate of approximately $30,117.77 on account of accrued wages, salaries, overtime, and other compensation (excluding reimbursable expenses) earned prior to the Petition Date ("Unpaid Wages"). The Debtors do not believe any employee is owed Unpaid Wages in excess of the priority caps set forth in sections 507(a)(4)–(5) of the Bankruptcy Code.

55.    During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, union dues, garnishments, child support, and other pre-tax deductions (each as defined) (collectively, the "Deductions"), and forward those amounts to various third-party recipients. The Debtors are also required by law to withhold from the Employees' Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and

pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes" and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Payroll Taxes is approximately $12,543.17.

56.     As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $13,018.17.

57.     The Debtors utilize Automatic Data Processing, Inc. ("ADP"), a third-party payroll service, to process and administer their Employee Compensation and Withholding Obligations. The Debtors' payroll is paid either by direct deposit through electronic funds transfer to the Employees' bank accounts or by physical check, at the Employee's election. On each applicable pay day, ADP makes direct deposit disbursements and issues payroll checks to the Employees. As of the Petition Date, the Debtors estimate that they owe ADP approximately $600.32 on account of payroll processing fees (the "Payroll Fees" and outstanding obligations related thereto, the "Unpaid Payroll Fees").[5/] Failure to pay the Unpaid Payroll Fees could lead to delayed disbursement of Employee Compensation to the Employees and Withholding Obligations to the appropriate third-parties to the detriment of the Employees and the Debtors' business.

58.     Prior to the Petition Date and in the ordinary course of their business, the Debtors reimburse Employees for certain expenses that such Employees incur in the scope of their

employment (the "Expense Reimbursements").    Expense Reimbursements typically include expenses for travel, lodging, relocation, ground transportation, meals, and other business-related expenses related to the discharge of an Employee's duties.    Expense Reimbursements are generally incurred by Employees through the use of personal funds, and the Employee may be held personally liable for any unpaid obligations.    The Debtors' inability to reimburse such expenses to these Employees could impose severe hardship on such individuals where such individuals otherwise incurred obligations for the Debtors' benefit.    As of the Petition Date, the Debtors are not aware of any outstanding Expense Reimbursements, but request authority to pay such amounts up to $5,000.

59.    The Debtors offer several insurance policies to eligible Employees for medical, dental, vision care coverage, long-term disability, prescription drug, accidental death, dismemberment, worker's compensation insurance, and certain other similar benefits (each as defined herein, and collectively, the "Health and Welfare Programs").    The following chart summarizes the Debtors' estimated aggregate amount of accrued, but unpaid, obligations with respect to the Health and Welfare Programs as of the Petition Date.

| Health and Welfare Programs | Accrued and Unpaid Obligations |
|---|---|
| Dental (self insured) | $0 |
| Workers Compensation | $0 |
| Long Term Care | $695.02 |
| **Total** | **$695.02** |

60.    The primary Health and Welfare Programs operated by the Debtors include:

> **Medical.**  The Debtors' medical coverage is provided through Blue Cross/Blue Shield ("BC/BS").  The Debtors cover 80% of the required premiums, with the Employee responsible for the remaining 20%.  The Employee-paid portion is

---

[5]/    For the avoidance of doubt, Unpaid Payroll Fees does not include amounts ADP may seek in connection with the Debtors' prepetition termination of a 401(k) plan.

automatically deducted from an Employees' paycheck and paid by the Debtors directly to BC/BS.

➢ **Dental.**  The Employee-paid portion of the Debtors' dental coverage is automatically deducted from each Employees' paycheck and paid by the Debtors directly to BC/BS.

➢ **Workers Compensation Premiums.**  The Debtors pay the premiums associated with workers compensation weekly based on classification of employees and actual payroll dollars.

➢ **Long term disability.**  The Debtors pay 66.66% of monthly earnings (up to a maximum of $2,700) for union employees and 66.66% of actual monthly base wages for salaried employees.  Such insurance is provided by Sun Life. Employees are only eligible after working for the Debtors for six months.

➢ **Vision Insurance.**  Vision insurance is provided for union Employees only based on actual claims, plus fees.  These amounts are paid monthly.

61.    Prior to the Idle Date, the Debtors provided a 401(k) plan, however, this program was terminated at the end of September 2014 and therefore no amounts are owed, other than fees to ADP for dissolving the plans and assisting employees with transferring their monies out of the plans.

62.    Prior to the Idle Date, the Debtors maintained several paid time-off benefit programs for Full-Time Employees, providing paid time off for vacation and sick leave ("Paid Time Off").  All Paid Time Off was paid by the Debtors before the Petition Date.  The Debtors estimate Paid Time Off will not exceed $1,000.

63.    The Employees provide the Debtors with services necessary to meet their goals in these Chapter 11 Cases, including the contemplated Sale, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time.  The Debtors further believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face.  Such Employees may then elect to seek alternative employment opportunities.  The Debtors therefore

believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value in these Chapter 11 Cases.

64.    In addition, the Wages Motion seeks relief from the automatic stay so that the Debtors' insurance carrier may provide coverage for workers' compensation claims. The Debtors' insurance company, and not the Debtors themselves, are defending such claims. The Debtors believe that cause exists to modify the automatic stay in order to allow these claims to proceed solely against the Debtors' insurance policy.

65.    The Debtors have sufficient funds to pay any amounts related to the Employee Compensation and Benefits. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Compensation and Benefits, as applicable. The Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made.

66.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Wages Motion should be granted

**C.**    **Debtors' Motion for Entry of Interim and Final Orders (A) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services; (B) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services; (C) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests; and (D) Granting Related Relief ("Utilities Motion")**

67.    In connection with the operation of their business, the Debtors use natural gas, electricity, water, telephone, internet, waste disposal, and other similar services (collectively, the "Utility Services") from certain utility companies or brokers (collectively, the "Utility Companies"). A nonexclusive list of the Utility Companies and their affiliates that provide

Utility Services to the Debtors as of the Petition Date (the "<u>Utility Services List</u>") is set forth

below:

| Account Number(s) | Provider | Type of Service | Address | Estimated Postpetition Average Monthly Usage |
|---|---|---|---|---|
| 11-74-53-9049 9 (warehouse) | Nicor Gas Company | Gas | PO Box 5407, Carol Stream, IL 60197-5407 | 3,750 Therms per Month $2,625 per Month |
| 6736651000 5 (mill) | Nicor Gas Company | Gas | PO Box 5407, Carol Stream, IL 60197-5407 | 0 Therms per Month $0 per Month |
| #1452671038 (warehouse) | ComEd | Electric | PO Box 6112, Carol Stream, IL 60197-6112 | 16,000 kWh per Month $1,760 per Month |
| 0870130055 (mill) | ComEd | Electric | PO Box 6112, Carol Stream, IL 60197-6112 | 3,469,092 kWh per Month $225,491 per Month |
| 9961-23140 (warehouse) | Village of Alsip | Water | 4500 W. 123rd Street, Alsip, IL 60803 | 25,000 Gal per Month $200.00 per Month |
| 17911-25012 (mill) | Village of Alsip | Water | 4500 W. 123rd Street, Alsip, IL 60803 | 50,000 Gal per Month $255.00 per Month |
| 1010-5114-0000 | Call One | Telephone | 225 W. Wacker Drive, Chicago, IL 60606 | $6,000/month |
| 708 385-1503 9426 708 245-5276 4534 708 213-0031 5387 | AT&T | Telephone | PO Box 5080 Carol Stream, IL 60197-5080 | $93/month $1,719.94/month $216.38/month |
| AT10039161 | AT Conference | Conferencing | PO Box 2939 Southampton, NY 11969 | $55/month |
| 2203 2205 | Business-Only Broadband | Internet | 900 Oakcreek Drive Lombard, IL | $900/month $250/month |
| 926714230 | Sprint | Telephone | PO Box 219100 Kansas City, MO 64121-9100 | $69.75/month |
| 3-0721-0090439 3-0721-0024341 | Allied Waste | Trash Removal | 13701 S. Kostner Crestwood, IL 60445 | $2,000/month |

| Account Number(s) | Provider | Type of Service | Address | Estimated Postpetition Average Monthly Usage |
|---|---|---|---|---|
| 899-1757001-2354-0 | Waste Management | Port-O-Potty Rental | 700 E. Butterfield Road, 4th Floor, Lombard, IL 60148 | $991.96 per Month |

68.    While the Debtors idled their facilities on September 5, 2014, they continues to require Utility Service.  The Debtors are not currently operating their business as a going-concern, but still must maintain their property at Mill and Warehouse.  In order to permit potential buyers of the Debtors' assets to view their facilities, the Debtors must have electricity for light and natural gas for heat.  The Debtors also continue to ship paper from the Warehouse and therefore it is important to keep that facility in operation.  Maintaining some level of heat in the facilities will also prevent damage to the Debtors' equipment and keep pipes from freezing.  Moreover, the Debtors require water and waste and disposal at the facilities in order to properly open these facilities to permit buyers to view the facilities.  Finally, the Debtors have a limited need for telephone and internet services since they continue to perform limited office and administrative services at the Mill and the Warehouse.[6/]

69.    Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to market their facility could be severely jeopardized, as would the Debtors' ability to preserve their assets.  Since the Idle Date, the Debtors' use of Utility Services has significantly declined.  Based on the Debtors' use since the Idle Date, the Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $242,627.03.  To the best of the Debtors' knowledge, none of the Utility

Companies hold deposits from the Debtors, nor do the Debtors have any existing prepayments with respect to any Utility Companies.

70.     In order to ensure that the Utility Services are not discontinued, the Debtors have proposed certain procedures to ensure that the Utility Companies have "adequate assurance" of payment for postpetition services in a form "satisfactory" to the Utility Company.  The proposed procedures are designed to ensure that the Utility Companies are adequately assured against any risk of nonpayment for future services for the relatively short period between the Petition Date and the closing of the contemplated sale of the Debtors' assets.  The Debtors have access to funds through their debtor in possession financing facility which will provide assurance that the Debtors pay their obligations during the case, including payments to the Utility Companies.  The Utility Companies are further protected by the Adequate Assurance Deposit.  Moreover, termination of the Utility Services could result in the Debtors' having to completely shut down their facility, which would cause their assets to rapidly diminish in value to the detriment of all stakeholders.

71.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

**D.      Debtors' Motion for Entry an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and (B) Honor any Insurance-Related Obligations in the Ordinary Course of the Debtors' Business and (II) Granting Related Relief ("<u>Insurance Motion</u>")**

72.     In the ordinary court of business, the Debtors maintain eight Insurance Policies that are administered by multiple third-party insurance carriers (collectively, the "<u>Insurance Carriers</u>").  The Insurance Policies provide coverage for, among other things, the Debtors' property, general liability, business automotive, pollution liability, workers' compensation,

---

[6/]   In addition to the Mill and the Warehouse, the Debtors maintain office space in Connecticut

directors & officers liability, employment practices liability, fiduciary liability, crime, and umbrella coverage.[7/] The Insurance Policies are described in the following chart:

| Type of Policy Coverage | Insurance Carrier | Policy Number | Expiration Date | Approximate Annualized Gross Premium[8] |
|---|---|---|---|---|
| Directors & Officers Liability Employment Practices Liability Fiduciary Liability | ARCH | PCD0036052-03 | January 31, 2015 (plus six year tail coverage) | $9,209 |
| Property | ACE American Insurance Company (Starr Tech) | EPR N09156707 | December 31, 2014 | $172,011 |
| General Liability | Hartford Underwriters Insurance Company (Hartford) | 08 UEN ZJ4667 | December 31, 2014 | $32,088 |
| Business Automobile | Sentinel Insurance Company, Limited (Hartford) | 08 UEN ZJ4667 | December 31, 2014 | $2,680 |
| Umbrella | Hartford Casualty Insurance Company (Hartford) | 08 RHU AA3200 | December 31, 2014 | $18,727 |
| Workers' Compensation | Hartford | 08 WE CL1552 | December 31, 2014 | $916,319 |
| Pollution Legal Liability New Conditions from 11/5/2009 | XL | PEC003916401 | May 31, 2015 | $25,906 |
| Pollution Legal Liability (Existing Conditions) | Lexington Insurance Company | 13405132 | November 6, 2016 | Paid in full in 2009 |

---

and New Jersey.  The Debtors anticipate vacating these offices shortly after the Petition Date.

[7/]    In addition, the Debtors have certain insurance relating to the collection of receivables.

[8]    The Approximate Annualized Gross Premium does not include any premium, tax or issuance fee unless otherwise indicated.

73.     Each of the Insurance Policies covers twelve months of coverage and was set to expire on November 5, November 6, or December 8, 2014.  The total of annual premiums due under the Insurance Policies for the twelve months prior to these Expiration Dates was approximately $1,177,000.[9/]

74.     Prior to the Petition Date, the Debtors worked with their Insurance Carriers to extend the duration of the Insurance Policies through at least December 31, 2014.[10/]  Since the Debtors are requesting a hearing to approve the sale of certain of its key assets in approximately five weeks from the Petition Date, such an extension will likely be of sufficient duration to meet the Debtors' needs and goals in this case.  The cost of the newly-negotiated extensions was approximately $62,000.

75.     While the Debtors have traditionally used premium financing in order to finance the Insurance Policies (since it is not economically advantageous to pay such premiums in full, on a lump-sum, quarterly, or monthly basis), all premiums related to the Insurance Policies have been paid in full through the newly-negotiated expiration dates.

76.     While the Debtors do not have any ongoing payment obligations under the Insurance Policies, they believed it prudent to request authority to continue insurance coverage entered into prepetition with respect to the eight Insurance Policies and honor any obligations related to the Insurance Policies in the ordinary course of the Debtors' business.

28.     The Debtors believe that they have paid all amounts owed under the Insurance Policies through the newly-negotiated extension dates.  Continuation of the Insurance Policies is

---

[9/]   This total is exclusive of the Illinois State Surplus Lines Tax.
[10/]  There are three exceptions to the December 31, 2014 end date.  The Debtors have extended their Directors & Officers policy through January 31, 2015 (and have also made arrangements for an additional six year tail coverage period), extended coverage on their pollution policy

essential to preserving the value of the Debtors' assets and minimizing exposure to risk.  Failure

to maintain the Insurance Policies would limit the Debtors' abilities to operate, resulting in a

material adverse effect on the Debtors' business and the value of their estates.

77.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief

requested in the Insurance Motion should be granted.

**E.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief (the "DIP Motion")**

78.    The Debtors require immediate access to liquidity to ensure that they are able to

preserve the value of the estates pending the proposed sale of their assets.  To that end, the

Debtors have secured an approximately $3,300,000 DIP Facility to ensure that overall enterprise

value can be preserved.

79.    The DIP Facility represents the best source of appropriately-sized financing

available to the Debtors under the circumstances, and was negotiated vigorously at arm's length

over the course of several weeks, resulting in terms that the Debtors submit are reasonable and

appropriate to meet the Debtors' financing needs during these chapter 11 cases. The DIP Facility

is an essential component of the Debtors' plan to sell their assets to the highest and best bidder at

an auction.

80.    Absent interim approval of the DIP Facility, there is a significant risk that the

Debtors would be forced to close their doors immediately and abort their plan to sell their assets,

thereby threatening the Debtors' estates, their creditors and especially the Debtors' employees

(current and former) many of whom would expect to obtain employment at the plant after the

_____

relating to existing conditions through 2016, and extended coverage on their pollution policy

sale transaction closes. The Debtors have extremely limited cash on hand and do not expect to generate sufficient levels of cash flow through the continued sale of its inventory during the Chapter 11 Cases. The DIP Facility is necessary in order for the Debtors to remain viable through the closing of a sale transaction. In addition, substantially all the Debtors' assets are encumbered by liens arising under its prepetition lending facility, and the Debtors believe the Prepetition Lender is materially undersecured. As a result, the Debtors do not believe third-party debtor-in-possession financing would be reasonably available and has determined that the proposed DIP Facility provides the best path forward under the circumstances to address the immediate liquidity needs, fund the Chapter 11 Cases, and provide a clear path toward a sale of the assets.

81.    The Debtors propose to use the DIP Loans and Cash Collateral to satisfy employee wages, employee benefits, certain other limited operational expenses as set forth in the Budget, and to fund administration of these chapter 11 estates in order to achieve a sale of the assets to a buyer that will preserve jobs in the area. Without access to the DIP Loans and Cash Collateral to satisfy these obligations, the Debtors will have insufficient funds to pay wages for its employees, preserve and maximize the value of their estates, and administer these Chapter 11 Cases. Thus, the Debtors' access to the DIP Loans and Cash Collateral will facilitate its efforts to maximize value for their stakeholders through the proposed sale transaction. Absent approval of the Interim DIP Order, the Debtors will not have access to the DIP Loans or the Cash Collateral necessary to fund administration of these chapter 11 estates, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders and other parties in interest.

---

relating to new conditions after November 5, 2009 through May 31, 2015.

82.     The Debtors believe that the Lender is likely undersecured in its claim on all of the Debtors' assets.  The proposed DIP Facility offered by the Lender allows the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of the Chapter 11 Cases.  Accordingly, the Debtors believe that the DIP Facility represents the best option available to address the immediate liquidity needs.  It is the product of extensive arm's length negotiations with the DIP Lender and is an essential component of the broader plan to sell the assets and preserve jobs.  Moreover, the DIP Facility represents the only viable financing available that would not require the Debtors to seek to prime the Prepetition Liens on a nonconsensual basis.

83.     For these reasons, on behalf of the Debtors, I respectfully submit that the relief requested in the DIP Motion should be granted.

**F.      Debtors' Motion for Orders (A) Establishing Bidding Procedures in Connection with Sale of Certain Real Estate and Equipment of the Debtors; (B) Approving the Form and Manner of Notices; (C) Setting a Sale Hearing; (D) Authorizing the Sale of the Assets Free and Clear of All Liens, Claims, and Encumbrances; and (E) Granting Related Relief (the "Sale Motion")**

84.     The Debtors, with the assistance of their investment banker, Sanabe, conducted a thorough marketing and sale process in order to ensure that the Debtors maximize the value received for their assets.  To this end, Sanabe prepared targeted marketing materials for more than sixty (60) potential purchasers, which led to twelve (12) potential purchasers visiting the Mill and Warehouse for management presentations and/or conducting additional due diligence.  Following these site visits, nine (9) parties submitted non-binding first-round bids ranging from $2.4 million to $10 million.  Sanabe, the Debtors, and the Debtors' legal and restructuring advisors reviewed these bids and invited seven (7) bidders to participate in the second round of the sale process.  From this process, two (2) potential purchasers emerged, and the Debtors (and their professionals) worked with these two companies to refine their offers.  Ultimately, the

Buyer was chosen by the Debtors (and their professionals) as having submitted the highest and best bid for the purchase of the Debtors' assets. The Buyer's offer was selected, in part, because of its ability to successfully consummate the contemplated transaction. According, the Buyer and the Debtors negotiated an APA to document the sale of certain real estate and equipment of the Debtors, subject to higher and better offers pursuant to the bidding procedures attached to the proposed Bid Procedures Order filed contemporaneously with the Sale Motion.

85.    The Debtors believe that the sale process contemplated by the Bidding Procedures, which is supported by the Lender as the Debtors' pre-petition lender, will allow the Debtors to maximize the value of their assets through a competitive an open process. Given the facts of this case, the Debtors believe that the terms of the proposed Bidding Procedures and Sale are fair, reasonable, and "market."

86.    Prior to the Petition Date, after consulting with their financial, legal, and restructuring professionals, the Debtors determined that a sale of the Assets was necessary. With the consent of the Lender, the Debtors' largest secured creditor, the Debtors implemented an orderly wind-down plan that included marketing the Assets for sale. This plan (including the proposed sale of the Assets) was intended to maximize the value received for the Assets for the benefit of the Debtors' major creditor constituencies.

87.    The Debtors believe that the break up fee and expense reimbursement requested in the Sale Motion (the "Bid Protections") are reasonable, given the benefit to the estate of having a definitive APA with a stalking horse bidder and the risk to a stalking horse bidder that a bid submitted by a different bidder would ultimately be accepted. The APA and the Debtors' agreement to pay the Bid Protections are the product of good faith, arm's-length negotiations between the Debtors and the Buyer. The terms and conditions of the Sale to Buyer were

negotiated by the Debtors at arms'-length and in good faith with the assistance of counsel and the Debtors' other advisors.

88.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Sale Motion should be granted.

## III     CONCLUSION

Accordingly, for the reasons stated herein and in each of the First Day Pleadings, the relief sought therein is in the best interests of the Debtors, their creditors and estates; and therefore, on behalf of the Debtors, I respectfully request that the First Day Pleadings be granted.

**[Remainder of Page Intentionally Left Blank]**

I declare under the penalty of perjury that the foregoing is true and correct.

Dated:

_____

Stephen L. Silver
President, Alsip Acquisition, LLC

[Alsip – First Day Affidavit]

34