## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ALSIP ACQUISITION, LLC., et al.,[1] | ) | Case No. 14-12596 (KJC) |
| | ) | |
| Debtors. | ) | |
| | ) | (Joint Administration Requested) |

## DEBTORS' MOTION FOR ORDERS (A) ESTABLISHING BIDDING PROCEDURES IN CONNECTION WITH SALE OF CERTAIN REAL ESTATE AND EQUIPMENT OF THE DEBTORS; (B) APPROVING THE FORM AND MANNER OF NOTICES; (C) SETTING A SALE HEARING; (D) AUTHORIZING THE SALE OF THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES; AND (E) GRANTING RELATED RELIEF

Alsip Acquisition, LLC (the "Seller" or "Alsip") and APCA, LLC ("APCA"; and together with Alsip, the "Debtors"), the above-captioned Debtors and Debtors in possession, by and through their undersigned attorneys, hereby file this motion (the "Motion") for the entry of orders (a) establishing bidding procedures (the "Bidding Procedures") in connection with the sale (the "Sale") of certain real estate and equipment (the "Assets") of the Debtors; (b) approving the form and manner of notice of the Sale and Bidding Procedures; (c) setting a hearing date to consider the approval of the Sale (the "Sale Hearing"); (d) authorizing the Sale of the Assets free and clear of all liens, claims, and encumbrances, subject to higher and better offers; and (e) granting related relief, with the United States Bankruptcy Court for the District of Delaware (the "Court"). In support of the Motion, the Debtors respectfully represent as follows:[2]

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Alsip Acquisition, LLC (Tax ID No. 27-0514908), and APCA, LLC (Tax ID No. 27-1033005).

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Stephen L. Silver in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## INTRODUCTION

2.      On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated as of the date this Motion was filed.

### The Debtors' Business and the Pre-Petition Sale Process

3.      Prior to the Debtors idling their facilities on September 5, 2014 (the "Idle Date"), the Debtors were the leading North American provider of responsibly made recycled paper for books and magazines, as well as for commercial printing and packaging applications.  The Debtors' operational and manufacturing headquarters are located in Alsip, Illinois, and consist of a mill located at 13101 South Pulaski Road, Alsip, Illinois 60803 (the "Mill") and a warehouse located at 13060 South Crawford Avenue, Alsip, Illinois 60803 (the "Warehouse").

4.      At its height, Alsip employed 116 hourly workers and 54 salaried personnel.  The hourly workers were represented by the United Steel, Paper and Forestry, Rubber,

2

Manufacturing, Energy, Allied Industrial and Service Workers International Union and its affiliated Local 1085 (collectively, the "USW"). Four employees (boiler engineers), who are no longer employed by the Debtors, were represented by International Union of Operating Engineers and its affiliated Local 399 (the "IBUE", and together with USW, the "Unions"). In the APA, the proposed Buyer (as defined below) has agreed that after Closing, should (i) the Buyer wish to hire employees for the plant and (ii) a majority of the representative complement of the employees being considered to work at the plant comes from the Unions' bargaining unit, Purchaser will recognize the Unions as the bargaining representative for such employees and will negotiate with the Union the terms and conditions of a new bargaining agreement.

5.    As described more fully in the First Day Declaration, the Debtors, with the assistance of their investment banker, Sanabe & Associates ("Sanabe"), conducted a thorough marketing and sale process in order to ensure that the Debtors maximize the value received for their assets. To this end, Sanabe prepared targeted marketing materials for more than sixty potential purchasers, which led to twelve potential purchasers visiting the Mill and Warehouse for management presentations and/or conducting additional due diligence. Following these site visits, nine parties submitted non-binding first-round bids ranging from $2.4 million to $10 million. Sanabe, the Debtors, and the Debtors' legal and restructuring advisors reviewed these bids and invited seven bidders to participate in the second round of the sale process. From this process, two potential purchasers emerged, and the Debtors (and their professionals) worked with these two companies to refine their offers. Ultimately, Resolute FP Illinois LLC (the "Buyer" or "Stalking Horse Bidder") was chosen by the Debtors (and their professionals) as having submitted the highest and best bid for the purchase of the Debtors' assets. The Buyer's offer was selected, in part, because of its ability to successfully consummate the contemplated

3

transaction.  According, the Buyer and the Debtors negotiated an asset purchase agreement (the

"APA") to document the sale of certain real estate and equipment of the Debtors, subject to

higher and better offers pursuant to the Bidding Procedures.

6.    The Debtors believe that the sale process contemplated by the Bidding

Procedures, which is supported by Wells Fargo Bank, National Association (the "Lender") as the

Debtors' pre-petition lender, will allow the Debtors to maximize the value of their assets through

a competitive open process.  Given the facts of this case, the Debtors believe that the terms of the

proposed Bidding Procedures and Sale are fair, reasonable, and "market."

## THE PROPOSED ASSET PURCHASE AGREEMENT

### A. Material Terms of the Proposed APA and Sale Order

7.    The Debtors and Buyer entered into the APA pursuant to which Buyer seeks to

purchase certain real estate and equipment of the Debtors, as set forth more fully on Schedule 1.1

of the APA (collectively, the "Assets").  In accordance with Bankruptcy Rule 6004 and Local

Bankruptcy Rule 6004-1, the material terms of the APA are as follows:[3]

- Proposed Buyer.  Resolute FP Illinois LLC.

- Seller.  Alsip Acquisition, LLC.

- Purchase Price.  The purchase price (the "Purchase Price") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Assets shall consist of $5,000,000, subject to certain adjustments set forth in Section 1.10 of the APA.

- Excluded Liabilities. Under the APA, Buyer shall not assume, and shall not be deemed to have assumed, and shall have no responsibility or obligation whatsoever for, any Liabilities of, or Claims against, the Seller or any of the Purchased Assets (collectively, the "Excluded Liabilities"), which shall include without limitation the following: (a) any successor or transferee liability of any

---

[3] A copy of the APA is attached hereto as Exhibit A and is incorporated herein by reference.  The description of the APA in this Motion is a summary and is superseded in all regards by the APA, and should not be used to interpret the APA or to resolve omissions or ambiguities in the APA (if any).  To the extent that any provision of this summary is inconsistent with the APA, the APA shall control.  Capitalized terms not otherwise defined in this Motion have the meanings ascribed to them in the APA.

4

kind or nature whether or not relating to any defective products; (b) any and all contracts or other agreements with any labor union, including any collective bargaining agreement, and any obligation relating to any employment contract or union contract; (c) wages, salary and vacation, holiday and personal time off accrued prior to, or in connection with, the Closing; (d) any obligations with respect to the employment of any of the Debtor' former or present Employees, including, without limitation, unemployment compensation, severance pay and any liability under the WARN Act or similar Laws; (e) any obligation to hire or otherwise employ any former or present Employee of the Seller, whether under any union agreements or otherwise; (f) any obligations under any employee benefit plan maintained by the Seller, or under which the Seller are obligated or bound, including, without limitation, those plans based on length of service with the Seller, or any other obligation owed to the former or present Employees of the Seller; (g) any Liabilities based upon, or arising out of, in whole or in part, any facts, circumstances or events existing or occurring at any time prior to the Closing, including any accounts payable or trade account payable; (h) any Liabilities of any kind or nature related to executory contracts or unexpired leases; (i) any Encumbrances (including, without limitation, mechanic's or warehousemen's liens) except Permitted Encumbrances held or asserted with respect to the Seller or any of the Purchased Assets; provided, however, the Seller shall have no obligation to pay any amounts due, whether or not liens, with respect to any tangible personal property not on premises; and (j) any Liability accrued prior to the Closing.

- "AS IS" Transaction.  The Sale is to be made on the following terms: (I) PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT THE SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS; (II) WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS; AND (III) ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

- Closing:  Conditional, upon satisfaction of the conditions set forth in Sections 5.1, 5.2 and 5.3 of the APA.

- Deposit for Stalking Horse Bidder.  The Buyer will provide a deposit in the amount of $500,000, which is 10% of the Purchase Price, within one (1) Business Day of the date of entry of the Bidding Procedures Order.

- Requested Findings as to Successor Liability.  For the reasons discussed below, pursuant to section 363(f) and 105(a) of the Bankruptcy Code, the Seller is seeking to sell the Assets to Buyer free and clear of all liens, claims, and encumbrances and without successor liability.

- Relief from Bankruptcy Rule 6004(h). The Debtors are seeking a waiver of the fourteen day stay under Bankruptcy Rule 6004(h) for the reasons discussed below.

## PROPOSED SALE AND BIDDING PROCEDURES

8.       The Debtors believe that it is in the best interests of their estates and their creditors to pursue the Sale under sections 105 and 363 of the Bankruptcy Code. In connection with the Sale, the Debtors believe that conducting an auction (the "Auction") in accordance with the Bidding Procedures among Qualified Bidders (as defined below) to obtain the highest or otherwise best offer will maximize the value of the estate. In accordance with Local Bankruptcy Rule 6004-1, the material aspects of the proposed Bidding Procedures[4] are set forth below.

## PROPOSED BIDDING PROCEDURES

### A.       The Bidding Process

9.       The Debtors shall (i) determine whether any person is a Qualified Bidder (as defined below), in each case following consultation with the Lender and any statutory committee appointed and acting in the Debtors' chapter 11 cases (each a "Committee"), (ii) coordinate the efforts of Potential Bidders (as defined below) in conducting their due diligence investigations of the Assets, (iii) receive offers from Qualified Bidders, and (iv) negotiate any offers made to purchase the Assets (collectively, the "Bidding Process"). Any person who wishes to participate in the Bidding Process must be a Potential Bidder, and any person who wishes to participate in the Auction must be a Qualified Bidder.

10.      Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who has not delivered to

---

[4] The Bidding Procedures are attached as "Exhibit 1" to the proposed Bid Procedures Order, which itself is attached as Exhibit B to this Motion. The summary of the Bidding Procedures provided herein is qualified in its entirety by the proposed Bid Procedures Order.

the Debtors an executed confidentiality agreement reasonably satisfactory in form and substance to the Debtors. Following consultation with the Lender and Committee, the Debtors have the sole right to determine and modify at any time, the Bidding Process or adopt such other rules for the Bidding Process, so long as such modifications are not inconsistent in any material respect with the Bidding Procedures of the APA. In each instance, such rules, waivers or modifications shall be announced to all Qualified Bidders, even if the bidding has already commenced.

### B.  Participation Requirements

Unless otherwise ordered by the Court, to participate in the Bidding Process and obtain access to the due diligence materials, each Potential Bidder must deliver to the Debtors the following (the "Potential Bid Documents"):

a. A statement fully disclosing the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and complete terms of any such participation;

b. An executed confidentiality agreement in form and substance acceptable to the Debtors (a "Confidentiality Agreement"); and

c. A statement setting forth the Potential Bidder's financial capability of providing a bid and containing financial and other information that will allow the Debtors to make a reasonable determination as to the Potential Bidder's financial ability to make the same.

A "Potential Bidder" is a person who delivers the Potential Bid Documents to the Debtors.

11.    To become a Qualified Bidder, each Potential Bidder must deliver to the Debtors by the Bid Deadline (as defined below), a written offer or group of offers that:

a. States that such Potential Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the APA or pursuant to an alternative structure that the Debtors determine is no less favorable than the terms and conditions of the APA;

b. Is accompanied by a clean and duly executed APA (the "Modified Agreement") and a marked Modified Agreement reflecting the variations from the APA, that contains a cash component of the purchase price of not less than $5,320,000 immediately upon the

7

closing of an Alternative Transaction, plus an initial overbid of $100,000;

c.  Includes a list identifying any and all executory contracts and unexpired leases of the Debtors that such Potential Bidder wishes to be assumed and assigned to the Potential Bidder at Closing pursuant to the Modified Agreement; provided, however, that the Potential Bidder shall have a right to modify the list of such executory contracts and unexpired leases at any time prior to closing;

d.  States that such Potential Bidder is financially capable of consummating the transactions contemplated by the Modified Agreement and contains financial and other information that will allow the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Agreement;

e.  States that such Potential Bidder's offer is irrevocable until the closing of the purchase of the Assets if such Potential Bidder submits the Prevailing Bid;

f.  Does not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

g.  Results in a value to the Debtors, in the Debtors' reasonable judgment that is more than the aggregate of the consideration being paid under the APA;

h.  (a) Does not contain any due diligence or financing contingencies of any kind; and (b) contains evidence that the bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to finance the purchase of the Assets, which evidence is reasonably satisfactory to the Debtors;

i.  Includes evidence of authorization and approval from the Potential Bidder's board of directors or comparable governing body with respect to the submission, execution, delivery, and closing of the Modified Agreement; and

j.  Is accompanied by a deposit (the "Deposit") in the form of a wire transfer of immediately available funds payable to the order of Alsip Acquisition, LLC in an amount equal to 10% of the cash purchase price specified in the Modified Agreement.  The Deposit of the Prevailing Bidder will be applied as follows: (a) first, to pay the Bid Protections to Buyer immediately upon the closing of an Alternative Transaction (as defined in the Motion), and (b) second, to pay the balance as a credit against the purchase price for the Prevailing Bidder. The Deposits of all other Potential Bidders will be refunded as set forth in the section titled "Return of Deposit" below.

(collectively, the "Required Bid Documents").

8

12.     A "Qualified Bidder" will be a Potential Bidder who, no later than 5:00 p.m. (Eastern Time) on the Bid Deadline (as defined in the Bidding Procedures), delivers the Required Bid Documents to the Debtors, including the Deposit.  Following consultation with the Lender and Committee, the Debtors will make a determination regarding whether a Potential Bidder has submitted a Qualified Bid that includes all of the Required Bid Documents and meets all of the above requirements.  Buyer is deemed to have submitted a Qualified Bid, is deemed a Qualified Bidder, and Buyer's bid is termed the "Stalking Horse Bid." Lender is deemed to be a Qualified Bidder for all purposes under these Bidding Procedures. Provided that Debtor receives a written request, the Debtor will also provide copies of each Qualified Bid to any non-debtor counterparties to executory contracts that are proposed to be assumed under any Qualified Bid or the Stalking Horse Bid.

## C.     **Due Diligence**

13.     The Debtors shall afford each Potential Bidder who has delivered to the Debtors an executed Confidentiality Agreement access to due diligence materials for the Assets.  The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such bidders.  The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline.  Neither the Debtors nor any of their representatives are obligated to furnish any information relating to the Assets to any person except to a Potential Bidder who has delivered an executed Confidentiality Agreement to the Debtors.  Potential Bidders are advised to exercise their own discretion before relying on any information regarding the Assets provided by anyone other than the Debtors or their representatives.

### D.    Bid Deadline

14.    A Potential Bidder that desires to make a bid shall deliver copies of its Potential Bid Documents to: (a) proposed counsel to the Debtors, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC, Attn: Kevin J. Walsh, Esq. (kjwalsh@mintz.com) and Pachulski Stang, Ziehl & Jones, LLP, Attn: Laura Davis Jones, Esq.  (ljones@pszjlaw.com), (b) counsel to the Lender, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox, Esq. (sfox@riemerlaw.com) and (c) counsel to the Committee, if any, on or prior to the Bid Deadline.

## PROPOSED BID PROTECTIONS

### A.    Break-Up Fee and Expense Reimbursement

15.    If the APA is terminated because, among other reasons, the Debtors consummate the Sale with the Prevailing Bidder and the Prevailing Bidder is not Buyer, and Buyer is not in default under the APA and is otherwise entitled to receive the Break-Up Fee and Expense Reimbursement (each as defined below, and together, the "Bid Protections"), the Debtors, consistent with the terms of the APA, will be required, from the proceeds of the sale to the Prevailing Bidder, following closing, to pay Buyer (a) a break-up fee in the amount of $170,000 (the "Break-Up Fee"), plus (b) the actual and documented out-of-pocket fees and expenses, including fees and expenses of legal advisors, financial advisors and accountants, incurred by the Purchaser in connection with the APA, the Chapter 11 Case, the Bidding Procedures and the transactions contemplated hereby and thereby in an amount not to exceed $150,000 (the "Expense Reimbursement").  The Bid Protections constitute allowed superpriority claims with priority over any and all administrative expenses senior to any and all liens and claims of any creditors of or holders of equity interests in the Debtors, including pre-petition and post-petition

amounts owing to the Lender, and will be payable out of the closing of an Alternative Transaction.

**B.**    **Representations and Warranties**

16.    The Sale of the Assets shall be on an "AS IS" and "WHERE IS" basis without representations or warranties of any kind as specified in the APA. Except as otherwise provided in the APA, all of the Debtors' right, title, and interest in and to the Assets, shall be sold free and clear of all Claims, Liens and Encumbrances except Permitted Encumbrances (as all such terms are defined in the APA, in accordance with section 363(f) of the Bankruptcy Code,) with such Claims, Liens and Encumbrances to attach to the net proceeds of the Sale of the Assets with the same validity, extent and priority that they may have in the Assets.

17.    Each Qualified Bidder will be deemed to acknowledge and represent that it has had an opportunity to inspect and examine the Assets and to conduct any and all due diligence regarding the Assets prior to making its offer, that it relied solely upon its own independent review, investigation and/or inspection of any documents and/or Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidding Procedures or, as to the Prevailing Bidder, in its own purchase agreement and that the Assets are being sold as is, where is, and with all faults.

**C.**    **Auction**

18.    After all bids of the Potential Bidders have been received, following consultation with the Lender and Committee, the Debtors shall determine if any of said bids constitutes a Qualified Bid and which, among all of the Qualified Bids, constitutes the highest and best bid.

11

The Debtors shall communicate their determinations to all Qualified Bidders as set forth in the Bidding Procedures.

19.    Thereafter, the Debtors shall conduct an Auction, but only if at least one Qualified Bid in addition to the Stalking Horse Bid is received at a place and time set forth in the Bidding Procedures. If, as of the Bid Deadline, the only Qualified Bid received by the Debtors is the Stalking Horse Bid, the Debtors will not conduct the Auction. The Auction shall be governed by the following procedures:

a.    Only Buyer and the Qualified Bidders shall be entitled to make any subsequent bids at the Auction.

b.    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

c.    Buyer and the Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative.

d.    Bidding shall commence at the amount of the highest Qualified Bid submitted by the Qualified Bidders prior to the Auction, as shall be announced by the Debtors at or before the commencement of the Auction.

e.    Buyer and the Qualified Bidders may then submit successive bids in increments of at least $50,000 higher than the bid at which the Auction commenced and all further bids must be at least $50,000 higher than the previous bid. For the avoidance of doubt, any successive bid made by the Buyer may be made in the amount of the then highest bid, less the amount of the Bid Protections, plus $50,000.

f.    Bidding at the Auction will be transcribed or videotaped.

g.    Buyer and the Qualified Bidders shall have the right to submit additional bids and make additional modifications to the APA at the Auction, consistent herewith, provided that any such modifications to the APA, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors than any prior bid by such party.

h.    The Debtors reserve the right to separately negotiate the terms of any bid at the Auction, provided the terms are fully disclosed at the time such bid is formally submitted.

i.    The Auction shall continue until there is only one offer that the Debtors determine, following consultation with the Lender and Committee, is the highest

and best offer from among the bids submitted by Qualified Bidders at the Auction.

j.    The highest and best offer from among the bids submitted by Qualified Bidders at the Auction, as determined by the Debtors, following consultation with the Lender and Committee, shall be termed the "Prevailing Bid". In making this decision, the Debtors shall consider, among other factors, the amount of the purchase price, the form of consideration being offered, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the APA requested by each bidder, and the net benefit to the Debtors' estates (including any payment of the Bid Protections to the Buyer).

k.    The bidder submitting such Prevailing Bid shall become the "Prevailing Bidder", and shall have such rights and responsibilities as set forth in the APA, as modified by the Prevailing Bidder. Within one (1) day after close of the Auction, the Prevailing Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Prevailing Bid was made.

l.    At the same time the Debtors determine the Prevailing Bid, the Debtors may, following consultation with the Lender and Committee, designate a bid (the "Back-Up Bid") submitted by a Qualified Bidder (including the Buyer) (the "Back-Up Bidder") to protect against the Prevailing Bid not being consummated. In the event the Prevailing Bidder is in default under the APA executed by such Prevailing Bidder, or the Debtors are in default under the APA and the Prevailing Bidder elects to not consummate the Sale, the Debtors may designate the Back-Up Bidder as the new Prevailing Bidder.

**D.**    **Acceptance of Qualified Bids**

20.    The Debtors shall sell the Assets for the highest and otherwise best bid received as determined by the Debtors (following consultation with the Lender and Committee) pursuant to the Bidding Procedures and approved by the Court. The Debtors' presentation to the Court for approval of a particular bid does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

DOCS_DE:196207.4 02980/001

E.    **Sale Hearing**

21.    The Debtors are requesting that the Sale Hearing be scheduled for no later than December 23, 2014 and that objections, if any, to the Sale must be filed in the Court and served so as to be received by 5:00 p.m. (Eastern Time) on the date that Qualified Bids are due.  The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing.

22.    In addition to seeking the Court's approval to consummate the Sale with the Prevailing Bidder, the Debtors shall request that it be authorized to consummate the Sale with the Back-Up Bidder, if necessary, without further approval or order of the Court.

23.    Following the Sale Hearing, if the Prevailing Bidder (of the Back-Up Bidder in the event the Back-Up Bidder is designated as the Prevailing Bidder) fails to consummate an approved Sale because of a breach or failure to perform on the part of such Prevailing Bidder, the defaulting Prevailing Bidder's deposit shall be forfeited to the Debtors, as more fully described in the APA.

F.    **Return of Deposit**

24.    Within three (3) business days after entry of the Sale Order substantially in the form attached hereto as Exhibit D, the Deposits of all Qualified Bidders, other than the Prevailing Bidder and the Back-Up Bidder (if any), shall be returned to such Qualified Bidders. The Deposit of the Back-Up Bidder shall be returned within three (3) business days after the closing of the Sale (unless the Back-Up Bidder is designated as the Prevailing Bidder).

25.    If the APA is terminated because, among other reasons, the Debtors consummates the Sale with the Prevailing Bidder and the Prevailing Bidder is not Buyer, and Buyer is not in default under the APA and is otherwise entitled to receive the Bid Protections, the Debtors will

be required, from the proceeds of the sale to the Prevailing Bidder, to pay to Buyer the Bid Protections at closing.

### G.    Notice of Bidding Procedures, Auction and Sale Hearing

26.    Promptly upon entry of the proposed order approving the Bidding Procedures, substantially in the form attached hereto as Exhibit B (the "Bid Procedures Order"), the Debtors will commence service of the Bid Procedures Order and the Notice of (I) Proposed Sale of Certain Real Estate and Equipment of the Debtors Free and Clear of All Liens, Claims and Interests; (II) Auction; and (III) Sale Hearing (the "Sale Notice"), substantially in the form attached hereto as Exhibit C, by mailing the Sale Notice and Bid Procedures Order via overnight mail, fax, and/or email to counsel to the Lender, any Committee, counsel to Buyer, and all parties identified by the Debtors that may have an interest in the Assets. The Sale Notice also will be mailed via first-class mail to the Notice Parties (as defined below).

### RELIEF REQUESTED

27.    By this Motion, the Debtors respectfully request the entry of orders (a) establishing the Bidding Procedures in connection with the Sale of the Assets to Buyer; (b) approving the form and manner of the Sale Notice; (c) setting a date for the Sale Hearing; (d) authorizing the Sale of the Assets free and clear of all liens, claims, and encumbrances; and (e) granting related relief.

### BASIS FOR RELIEF REQUESTED

### A.    Approval of the Sale is Warranted Under Sections 105 and 363 of the Bankruptcy Code

28.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Under section 105(a) of the Bankruptcy Code, the Court "may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions" of section 363.

29.     Although the Bankruptcy Code does not explicitly set forth a standard for determining when it is appropriate for a court to authorize the sale of property of the estate, courts in this district and elsewhere have found that a debtor's sale of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Eagle Picher Holdings, Inc.,* 2005 Bankr. LEXIS 2894, at *3 (Bankr. S.D. Ohio 2005); *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Boston Generating, LLC,* 440 B.R. 302, 321 (Bankr. S.D.N.Y. 2010). Once the debtor articulates a valid business justification for the sale, the business judgment rule acts as "a presumption that in making the business decision the directors of [the] corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.,* 186 B.R. 98 (Bankr. N.D. Ill. 1995) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)); *see also In re Integrated Res., Inc.,* 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.,* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a Debtor's management decisions.").

30.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. *See Myers,* 91 F.3d at 395; *see also Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.D.C. 1991); *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"). The Debtors have a

16

sound business justification for selling the Assets pursuant to the Bidding Procedures at this time.  Prior to the Petition Date, after consulting with their financial, legal, and restructuring professionals, the Debtors determined that a sale of the Assets was necessary.  With the consent of the Lender, the Debtors' largest secured creditor, the Debtors implemented an orderly wind-down plan that included marketing the Assets for sale.  This plan (including the proposed sale of the Assets) was intended to maximize the value received for the Assets for the benefit of the Debtors' major creditor constituencies.

31.    The Notice Parties (as defined below) will receive notice of this Motion, the Bid Procedures Order, and the Sale Notice (which includes notice of the Sale Hearing).  Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties potentially interested in bidding on the Assets, and others whose interests are potentially implicated by the proposed Sale.  As discussed in detail above, the Sale of the Assets was subject to an extensive pre-petition marketing process that resulted in the selection of the Buyer as the Stalking Horse Bidder.  To better ensure that the Debtors receive the highest and best value for the Assets, the proposed Sale will be subject to higher and better offers pursuant to the Bidding Procedures and Auction.  Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the pre-petition marketing process and the procedures described herein, including the Auction process, which is the best method to establish whether a fair and reasonable price is being paid.

32.    In order to effectuate the Sale, the Debtors request authorization to sell the Assets free and clear of liens, claims, encumbrances, and interests (other than the Permitted Encumbrances), with all such liens, claims, encumbrances, and interests to attach to the net

proceeds of the Sale of the Assets with the same validity, extent and priority that they may have in the Assets.

33.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

2)    such entity consents;

3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4)    such interest is in bona fide dispute; or

5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *See In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) ("[Section 363(f)] is written in the disjunctive, not the conjunctive. Therefore, if any of the five conditions of § 363(0 are met, the Trustee has the authority to conduct the sale free and clear of all liens."); *see also In re Kellstrom Indus.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002); *Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994).

34.    The Lender has consented to a free and clear sale to the Buyer (other than the Permitted Encumbrances), and, in the event Buyer is not the Prevailing Bidder, pursuant to the Bidding Procedures.

35.    With respect to all other parties that may assert a lien, claim, encumbrance, or interest on or against the Assets, such parties will have their interest (if any) attach to all proceeds (if any) ultimately attributable to the Assets in which such creditor alleges an interest, in the same order of priority and with the same validity, force and effect that such creditor had

18

prior to the Sale, subject to any claims and defenses the Debtors and their estates may have with respect thereto. *See Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV,* 209 F.3d 252, 259 (3d Cir. 2000); *In re Elliot,* 94 B.R. at 345; *In re Circus Time, Inc.,* 5 B.R. 1, 7 (Bankr. D. Me. 1979). This is the same treatment that such parties would receive in the event the Lender were to foreclose on its collateral pursuant to the Uniform Commercial Code and Illinois law. Under such circumstances, any junior liens or encumbrances would only receive payment on account of such interests to the extent there was equity remaining after Wells Fargo as the senior lienholder was paid in full. *See, e.g.,* § 810 ILCS 5/9-622 (secured party's acceptance of collateral in full or partial satisfaction of the obligation it secures terminates any other subordinate interest); § 735 ILCS 5/15-1402 (foreclosure vests absolute title in the property in the mortgagee free and clear...of all rights of all other persons...whose interests are subordinate to that of the mortgage).

36.    Therefore, the Debtors may sell the Assets free and clear of all liens, claims, encumbrances, and interests on the terms set forth in the APA.

37.    The Debtors are further requesting that the Sale Order provide that, in connection with the Sale, the Prevailing Bidder will acquire the Assets free and clear of any successor liability. Such a provision is typical for buyers to require in connection with a Section 363 sale. *See generally, In re Trans World Airlines, Inc.,* 2001 Bankr. LEXIS 723, at *13-14 (Bankr. D. Del. Mar. 27, 2001) (noting that sales "free and clear . . . of successor liability claims achieves the purpose of § 363 intended by Congress" and that "the prospect of successor liability would deter bidders and could create a serious impediment to the ability of debtors to effect going concern sales under § 363"). The Debtors' major creditors will receive notice of this requested relief, as the proposed Sale Notice will indicate that the Debtors are proposing to sell the Assets

free and clear of all liens, claims, encumbrances, and successor claims (other than the Permitted Encumbrances).

38.     Courts in this district and others have granted similar relief in the context of a Section 363 sale. *See, e.g., In re Jancor Co.,* Case No. 08-12556 (MFW) (Bankr. D. Del. Jan. 12, 2009); *see also In re Fortunoff,* Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Mar. 6, 2008); *In re Dana Corp.,* Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Jun. 6, 2007).

**B.   The Bidding Procedures Are Reasonable and Appropriate**

39.     Bankruptcy Rule 6004(f)(1) provides that all "sales not in the ordinary course of business may be by . . . public auction." The Debtors believe that the proposed Bidding Procedures will ensure that the bidding process with respect to its Assets is fair and reasonable and will yield the maximum value for its estate and creditors. The Bidding Procedures provide for an Auction, and the bidder that submits the highest or otherwise best offer at the Auction will be selected as the Prevailing Bidder.

40.     The Bidding Procedures set deadlines for submitting bids, determining Potential Bidders and Qualified Bidders, conducting the Auction, and holding a Sale Hearing. Although the Debtors conducted a full marketing and bidding process before the Petition Date (and will continue that process in connection with the Auction), the Debtors have limited financing available to them and therefore request that it be permitted to conduct the sale process in the manner and on the timetable set forth herein and in the Bidding Procedures to maximize the value of the Assets.

41.     In light of the foregoing, the Debtors believe that the Court should approve the Bidding Procedures, including the dates established thereby for the Auction and the Sale Hearing. Similar procedures have been previously approved by courts in this district and others.

*See, e.g., In re Jancor Co.,* Case No. 08-12556 (MFW) (Bankr. D. Del. Dec. 18, 2008); *In re Ultimate Electronics, Inc.,* Case No. 05-10104 (PJW) (Bankr. D. Del. Apr. 20, 2005); *see also In re Steve & Barry's LLC,* Case. No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008); *In re Fortunoff,* Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008); *In re G+G Retail, Inc.,* Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); *In re Footstar, Inc.,* Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004).

### C. The Bid Protections Fee Should Be Approved

42. To compensate the Stalking Horse Bidder for subjecting its bid to higher or better offers, the Debtors seek approval of the Break-Up Fee in the amount of $170,000, plus (b) the actual and documented out-of-pocket fees and expenses, including fees and expenses of legal advisors, financial advisors and accountants, incurred by the Purchaser in connection with the APA, the chapter 11 cases, the Bidding Procedures and the transactions contemplated hereby and thereby in an amount not to exceed $150,000.

43. The Debtors believe that these Bid Protections are reasonable, given the benefit to the estate of having a definitive APA with a Stalking Horse Bidder and the risk to any Stalking Horse Bidder that a bid submitted by a different Qualified Bidder would ultimately be accepted. For these reasons, the Debtors submit that the Bid Protections are necessary to preserve and enhance the value of the Debtors' estates.

44. Break-up fees and other termination fees are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets.... In fact, because the... corporation ha(s) a duty to encourage bidding, break-up fees can be <u>necessary</u> to discharge [such] duties to maximize values.

21

*Integrated Res.*, 147 B.R. at 659-60 (emphasis in original). Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted); *see also Integrated Res.*, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

45.    Historically, bankruptcy courts have approved bidding incentives similar to the Bid Protections, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

46.    In addition to the traditional business judgment rule, the Third Circuit established standards for determining the appropriateness of bidding incentives in the bankruptcy context. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estates. *See id.*, at 533.

47.     The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  Second, where the availability of bidding incentives induces a bidder to research the value of the debtor's assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

48.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the maximum Bid Protections of $320,000 proposed here pass muster.  The Debtors' agreement to pay the Bid Protections are the product of good faith, arm's-length negotiations between the Debtors and the Buyer.  The Bid Protections are fair and reasonable in amount, and are reasonably intended to compensate for the risk to the Buyer of being used as a stalking horse.

49.     Furthermore, the Bid Protections are approximately six percent (6%) of the Buyer's proposed purchase price, which is within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases, particularly when compared to sales of a similar magnitude.  *See, e.g., In re Global Motorsport Group, Inc., et al.,* (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a break-up fee of approximately 4%, or $500,000 in connection with sale); *In re FoxMeyer Corp. et al.,* Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors'

assets). For the reasons set forth above, the Debtors respectfully request approval of the proposed Bid Protections.

### D. Buyer is a Good Faith Purchaser

50.     Section 363(m) of the Bankruptcy Code protects the sale of a debtor's property to a good faith purchaser. Specifically, section 363(m) provides "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." *See Cinicola v. Scharffenberger*, 248 F.3d 110, 121 (3d Cir. 2001) ("To promote certainty and finality in bankruptcy sales, § 363(m) prohibits the reversal of a sale to a good faith purchaser of bankruptcy estate property if a party failed to obtain a stay of the sale."); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.").

51.     Although neither the Bankruptcy Code nor the Bankruptcy Rules define "good faith purchaser," the United States Court of Appeals for the Third Circuit has held that the misconduct that would destroy a purchaser's good faith status at a judicial sale typically involves "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies*, 788 F.2d 143, 147-48 (3d Cir. 1986) (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978*)); see also In re Bedford Springs Hotel, Inc.* 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.* 186 B.R. 833, 839 (D.N.J. 1995); *Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs.*, 111

24

F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

52.    The terms and conditions of the Sale to Buyer were negotiated by the Debtors at arms'-length and in good faith with the assistance of counsel and the Debtors' other advisors. Accordingly, the Debtors request the Court determine Buyer to be acting in good faith and be entitled to the protections afforded to good faith purchasers under section 363(m) of the Bankruptcy Code.

## WAIVER OF RULE 6004 STAY

53.    Upon entry of any Order authorizing the sale of the Debtors' Assets, the Debtors will need to close and implement the APA as soon as possible in order to permit the Prevailing Bidder to start using the Debtors' facility and restart the business.  This will increase the likelihood of employees being re-hired and vendors re-engaged.  Thus, the Debtors submit that cause exists for a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h) to the extent applicable.

## NOTICE

54.    Notice of hearing on the Bidding Procedures set forth in this Motion, has been or will be provided to the following parties, or their counsel, if known: (a) Wells Fargo Bank, National Association as the Debtors' secured lender; (b) the United States Trustee for the District of Delaware; (c) the Office of the Attorney General for the State of Illinois; (d) the Department of Revenue for the State of Illinois and the Internal Revenue Service; (e) the Debtors' secured creditors and lessors that have filed financing statements; (f) the Debtors' twenty-five (25) largest unsecured creditors; (g) the Stalking Horse Bidder; (h) the Unions; (i) all entities known

25

to have expressed an interest in bidding on the Assets; and (j) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.

55.     As set forth above, upon entry of the Bid Procedures Order, the Debtors will (a) provide a copy of the Sale Notice and Bidding Procedures on the same parties as listed above and the following parties (collectively, the "Notice Parties"): (i) the Internal Revenue Service, (ii) the Securities and Exchange Commission; (iii) all other applicable state and federal taxing authorities having jurisdiction over the Assets; (iv) the United States Department of Justice;  (v) all applicable state attorneys general and local regulatory authorities; and (vi) all known creditors of the Debtors.  In addition, the Debtors will publish the Sale Notice in the Chicago Tribune as soon as practicable after entry of the Bid Procedures Order.  In light of the foregoing and the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

## **NO PRIOR RELIEF**

56.     No previous motion for the relief sought herein has been made to this or any other Court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the orders, substantially in the forms filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: November 20, 2014

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Colin R. Robinson (Bar No. 5524)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  ljones@pszjlaw.com
          crobinson@pszjlaw.com
          pkeane@pszjlaw.com


-and-

Richard E. Mikels (BBO No. 345620)
Kevin J. Walsh (BBO No. 629984)
Charles W. Azano (BBO No. 655775)
Mintz, Levin, Cohn, Ferris,
Glovsky and Popeo P.C.
One Financial Center
Boston, Massachusetts 02111
Telephone.: (617) 542-6000
Facsimile: (617) 542-2241
E-mail:  rmikels@mintz.com
          kwalsh@mintz.com
          cazano@mintz.com


[Proposed] Counsel for Debtors and Debtors in Possession

DOCS_DE:196207.4 02980/001