# EXHIBIT A

Asset Purchase Agreement

DOCS_DE:196207.4 02980/001

## ASSET PURCHASE AGREEMENT

by and between

**Resolute FP Illinois LLC**

as Purchaser,

and

**Alsip Acquisition, LLC**

as Seller

dated

**November 20, 2014**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement" or the "Purchase Agreement") is made and entered into as of November 20, 2014, between Alsip Acquisition, LLC, a Delaware limited liability company ("Seller"), and Resolute FP Illinois LLC, a Delaware limited liability company ("Purchaser"). A glossary of defined terms used in this Agreement is set forth in Section 8.15 below.

## WITNESSETH:

WHEREAS, promptly, and in no event later than two (2) Business Days after the date of execution of this Agreement, Seller shall file a petition seeking protections as a debtor and debtor in possession in that certain bankruptcy case titled In re *Alsip Acquisition, LLC.*, Debtor, (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Seller owns and desires to sell to Purchaser, and Purchaser desires to purchase from Seller, certain assets of the Seller;

WHEREAS, in connection with the Chapter 11 Case and subject to the terms and conditions contained herein and following the entry of the Sale Order finding the Purchaser as the winning bidder and subject to the terms and conditions thereof, Seller shall sell, transfer and assign to the Purchaser, and the Purchaser shall purchase and acquire from Seller, pursuant to Sections 363 and 105 of the Bankruptcy Code, the Purchased Assets, as more specifically provided herein and in the Sale Order; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court of, and will be consummated only pursuant to, this Agreement and a Sale Order to be entered in the Chapter 11 Case.

NOW, THEREFORE, in consideration of the premises and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
PURCHASE AND SALE OF ASSETS

1.1    Purchase and Sale of Assets.

(a)    Purchased Assets. Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, in consideration of the Purchase Price to be paid by Purchaser on the Closing Date, the Purchaser shall purchase, acquire and accept from the Seller, and Seller shall sell, transfer, assign, convey and deliver to the Purchaser, all of the Seller's right, title and interest in, to and under, free and clear of all Liens, Claims, Liabilities and Encumbrances (other than the Permitted Encumbrances), all of the Real Property, equipment, spare parts and other assets of

the Seller (except Excluded Assets), including, without limitation, those assets as listed on **Schedule 1.1** (collectively, the "Purchased Assets"). The Purchased Assets shall also include (i) to the extent assignable, without the outlay of cash (as discussed in Section 4.1(a)) by the Seller and requested by Purchaser, at its discretion, Seller's rights under all of its Permits, (ii) coverage, as a named insured, under the PLL Insurance, and (iii) books and records related to the Purchased Assets.

(b)  Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall exclude all of the following (collectively, the "Excluded Assets"):

(i)  accounts receivable, negotiable instruments, chattel paper and other receivables;

(ii)  tangible personal property of the Seller not in the possession of Seller to the extent that Seller would be required to pay any amount to a third party to make them available to Purchaser, it being the intention of the parties that these assets will be available to Purchaser subject to Purchaser's willingness to pay such amounts or any amounts negotiated between Purchaser and the relevant third party, in each case with no liability of Seller;

(iii)  Seller's rights under this Agreement and all cash and non-cash consideration payable or deliverable to Seller pursuant to the terms and provisions hereof;

(iv)  all cash deposits and prepaid items;

(v)  all cash and cash equivalents (including checking account balances, certificates of deposit and other time deposits and petty cash) and marketable and other securities relating to or arising in connection with the operation of the Seller's business;

(vi)  finished goods inventory existing on the Closing Date;

(vii)  all tax refunds, rebates, credits and similar items relating to or arising out of the operation of the Seller's business and to any period, or portion of any period, on or prior to the Closing Date;

(viii)  all insurance proceeds (including, without limitation, any insurance policies held by any Seller which insure the directors and officers of Seller against liability and any and all proceeds of any such insurance policies), claims and causes of action, except such rights and interest under insurance policies as are included among the Purchased Assets pursuant to the provisions of Section 1.1(a) above;

(ix)  all real property leases, other leases and other contracts (verbal or written) to which Seller is a party;

(x)  all securities, whether capital stock or debt, of Seller or any other entity;

(xi)  all tax records, minute books, stock transfer books and corporate seal of Seller; provided however, Seller shall provide Purchaser with copies of its books and records related to the Purchased Assets on or prior to the Closing Date;

(xii)    any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller and any collateral;

(xiii)    all rights, claims and causes of action of Seller against any person or entity; and

(xiv)    all preference or avoidance claims and actions of Seller, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code.

1.2    [Reserved]

1.3    <u>Excluded Liabilities.</u> The Purchaser shall not assume, and shall not be deemed to have assumed, and shall have no responsibility or obligation whatsoever for, any Liabilities of, or Claims against, the Seller or any of the Purchased Assets (collectively, the "<u>Excluded Liabilities</u>"), which shall include without limitation the following:

(a)    any successor or transferee liability of any kind or nature whether or not relating to any defective products;

(b)    any and all contracts or other agreements with any labor union, including any collective bargaining agreement, and any obligation relating to any employment contract or union contract;

(c)    wages, salary and vacation, holiday and personal time off accrued prior to, or in connection with, the Closing;

(d)    any obligations with respect to the employment of any of Seller's former or present Employees, including, without limitation, unemployment compensation, severance pay and any liability under the WARN Act or similar Laws;

(e)    any obligation to hire or otherwise employ any former or present Employee of Seller, whether under any union agreements or otherwise;

(f)    any obligations under any employee benefit plan maintained by the Seller, or under which the Seller is obligated or bound, including, without limitation, those plans based on length of service with Seller, or any other obligation owed to the former or present Employees of Seller;

(g)    any Liabilities based upon, or arising out of, in whole or in part, any facts, circumstances or events existing or occurring at any time prior to the Closing, including any accounts payable or trade account payable;

(h)    any Liabilities of any kind or nature related to executory contracts or unexpired leases;

(i)    any Encumbrances (including, without limitation, mechanic's or warehousemen's liens) except Permitted Encumbrances held or asserted with respect to the Seller or any of the Purchased Assets; provided, however, the Seller shall have no obligation to pay any amounts due, whether or not liens, with respect to any tangible personal property not on premises; and

3

(j)      any Liability accrued prior to the Closing.

1.4      [Reserved]

1.5      "As Is" Transaction. Except as otherwise provided in this Agreement or in the Sale Order: (I) PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT THE SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS; (II) WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS; AND (III) ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

1.6      Purchase Price. The aggregate consideration to be paid by the Purchaser to the Seller for the Purchased Assets (collectively, the "Purchase Price") shall be $5,000,000.00, as adjusted pursuant to section 1.10 (the "Cash Price").

1.7      Payment of the Purchase Price. Within one Business Day of the date of entry of a Bidding Procedures Order providing for the payment of the Bid Protections, Purchaser shall pay to the Seller by wire transfer of immediately available United States funds, into an escrow account to be established by mutual agreement of the Seller and the Purchaser consistent with the terms of this Agreement, the amount of $500,000.00 as a deposit (the "Deposit"). The Purchaser and the Seller will choose the escrow agent (the "Escrow Agent"). Both Seller and Purchaser agree that counsel to the Seller is an acceptable escrow agent. On the Closing Date, the Purchaser shall pay to the Seller by wire transfer of immediately available United States funds into an account to be designated by the Seller or its designee an amount equal to the Purchase Price less the sum of the Deposit (the "Closing Date Payment") and Purchaser and Seller shall cause the Escrow Agent to (and the Escrow Agent shall) deliver the Deposit to the Seller. The Escrow Agent shall return the full amount of the Deposit (without interest) to Purchaser within three (3) Business Days of a termination of this Agreement pursuant to Section 6.4 below. Notwithstanding the foregoing, if the Agreement is terminated pursuant to Section 6.4 (g), (j) or (m) and all of the conditions precedent set forth in sections 5.1 and 5.3 have been satisfied, the Purchaser will not be entitled to the return of the Deposit. If the Purchaser is not entitled to the return of the Deposit for the reasons set forth above, the Escrow Agent shall pay the full amount of the Deposit, as liquidated damages to the Seller, in full and final satisfaction of any and all liability of Purchaser hereunder or related in any way to the transactions contemplated hereby. Upon any termination of this Agreement, Purchaser shall have no other liability under this Agreement. Upon any termination of this Agreement, the Seller shall likewise have no liability upon termination of this Agreement except for the return of the Deposit, to the extent required, and, if applicable, the Bid Protections.

1.8      Allocation of Purchase Price. The Purchase Price shall be allocated among the Purchased Assets as determined by the Purchaser in its sole discretion (with such allocation to be provided to Seller within 90 days following the Closing). Seller shall not take a position on any Tax Return (including, without limitation, any Internal Revenue Service ("IRS") Form 8594 and any amendments thereto), before any Governmental Body charged with the collection of any Tax, or in any proceeding that is inconsistent with such allocation (taking into account any adjustments and subsequent amendments required by law) or otherwise inconsistent with this Section 1.8 without the prior written consent of Purchaser. Seller shall make any of its IRS

Forms 8594 (and any amendments thereto) filed with the IRS available for inspection by Purchaser for the purpose of verifying compliance with this Section 1.8.

1.9 <u>Taxes</u>. All Taxes payable or accrued in respect of the Purchased Assets prior to the Closing Date shall remain Liabilities of the Seller. The Purchaser shall be liable for and shall pay all transfer and other similar Taxes, duties, fees or other like charges of any jurisdiction properly payable in connection with the transfer of the Purchased Assets by the Seller to the Purchaser.

1.10 <u>Taxes and Assessments</u>. If any Taxes (including, but not limited to, real estate taxes, personal property tax, ad valorem tax and similar non-income Taxes), other assessments or utility charges relating to, or arising out of the ownership, use or transfer of, the Purchased Assets (including, but not limited to any water, sewer and other municipal charges owed to any governmental authority and utility charges), imposed on a periodic basis beginning before and ending after the Closing Date (collectively "<u>Pro Rated Items</u>"), (i) have been paid by Seller at any time on or prior to the Closing Date and are attributable in whole or in part to any period of time following the Closing, or (ii) accrued on or after the Petition Date but have not been paid by Seller at any time on or prior to the Closing Date, then the Purchase Price payable at Closing shall be modified to adjust for the portion of such prior payment of Pro Rated Items by Seller that is attributable to the post-Closing period; provided, however, that final payments with respect to Pro Rated Items that are not able to be calculated on the Closing Date shall be calculated and paid as soon as practicable thereafter.

1.11 <u>Removal of the Excluded Assets</u>. Seller shall, at no expense for Purchaser, remove all Excluded Assets from the mill premises prior to Closing.

**ARTICLE II**
REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to, and covenants and agrees that:

2.1 <u>Organization and Good Standing.</u> Seller has been duly organized and is validly existing as a limited liability corporation in good standing under the laws of the State of Delaware with full limited liability company power and authority to own and lease its properties and to conduct its business as currently conducted. Seller has no Subsidiaries.

2.2 <u>Execution and Delivery.</u> Subject only to obtaining Bankruptcy Court approval pursuant to the Sale Order, this Agreement has been duly authorized by all necessary corporate action on the part of Seller, has been duly executed and delivered by Seller and without any consent required, constitutes the legal, valid and binding agreement of Seller enforceable against Seller in accordance with its terms. Following the approval of this Agreement and the transactions contemplated hereby by the Bankruptcy Court pursuant to the Sale Order, this Agreement constitutes, and each of the documents and instruments with respect to the Purchased Assets necessary to effectuate the transfer thereof, when so executed and delivered, will constitute, legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including

principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

2.3   No Conflicts. The execution, delivery and performance of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby will not conflict with or result in the violation of (i) the provisions of the Organizational Documents of Seller, (ii) any judgment or order entered against the Seller in an action or proceeding to which such Seller is a party by any court or administrative agency, or (iii) any applicable Laws.

2.4   Financing. Upon Bankruptcy Court approval of a DIP Order/Cash Collateral Order, Seller has or will have sufficient internal funds available to pay budgeted expenses incurred by the Seller in connection with the Purchased Assets and maintain the Purchased Assets in an "indefinite idle" state and appropriately winterized in a manner substantially consistent with the procedures described in **Schedule 2.4**, both of which shall be undertaken using a reasonable standard of care applicable to the industry, through the Closing Date. Prior to the Petition Date, the Seller shall provide the Purchaser with a draft motion seeking approval of the DIP Order/Cash Collateral Order, including a proposed budget, demonstrating the Seller's ability to pay such expenses incurred by the Seller in connection with the Purchased Assets and maintain the Purchased Assets in an "indefinite idle" state and appropriately winterized in a manner substantially consistent with the procedures described in **Schedule 2.4**, both of which shall be undertaken using a reasonable standard of care applicable to the industry, through the Closing Date.

2.5   First Day Motions; Operations After the Petition Date. Prior to execution of this Agreement, Seller has provided Purchaser with substantially final drafts of all "first day" motions and proposed orders that the Seller intends to file with the Bankruptcy Court, subject to later amendments which shall be provided to Purchaser. The Seller shall maintain the Purchased Assets in an "indefinite idle" state and appropriately winterized in a manner substantially consistent with the procedures described in **Schedule 2.4**, both of which shall be undertaken using a reasonable standard of care applicable to the industry, through the Closing Date, and will seek the necessary "first day" relief from the Bankruptcy Court to maintain the Purchased Assets in such a state.

2.6   Absence of Certain Developments. Since the closing of the Seller's plant on September 4, 2014,  there has not been, singly or in the aggregate, any event, change, occurrence, circumstance, damage, destruction or physical loss, whether or not covered by insurance, with respect to the Purchased Assets that could reasonably be expected to have a Material Adverse Effect, except the aforesaid plant closing.

2.7   Title to Purchased Assets. The Seller owns and has good title to each of the Purchased Assets and at the Closing, the Seller shall convey each of the Purchased Assets free and clear of all Encumbrances, Claims and interests other than Permitted Encumbrances.

2.8   [Reserved]

2.9   Permits. Set forth in **Schedule 2.9** is a listing of Permits that are required in the operation of the Purchased Assets as a coated paper mill and de-inking plant as operated by the

Seller in the Ordinary Course of Business until September 4, 2014, and a description of whether (i) they are in good standing, (ii) subject to litigation or potential litigation that may result in termination or revocation thereof, or (iii) an event or issue could create an issue in the assignment or transfer of any such Permits to Purchaser.

2.10    Compliance with Laws.    Subject to the Chapter 11 Case, the Seller is in compliance in all material respects with all Laws of any Governmental Body applicable to its operations, the Purchased Assets or the Seller's Business. Except as set forth Schedule 2.9, Seller has not received any written or other notice of or been charged with the violation of any Laws nor, to the Knowledge of Seller, is the Seller under investigation with respect to the violation of any Laws, in each case that would adversely affect the ability of the Purchaser to utilize the Purchased Assets in the Ordinary Course of Business as a coated paper mill and de-inking plant.

2.11    Environmental Matters.

(a)    Seller has furnished to the Purchaser complete and accurate copies of all environmental audits, reports, reliance letters, tank closure Permits, discharge or other operating Permits, and other environmental documents relating to the Real Property in the Seller's possession or requested by the Purchaser.  Nothing in this section 2.11(a) shall require the Seller to undertake any new audit, report or other environmental documentation.

(b)    Since November 6, 2009, no disclosure (verbal or written) was made by Seller (or, to the Knowledge of Seller, for and on behalf of Seller or any predecessor owner or operator of any of the Purchased Assets) to (i) any Governmental Body in connection with environmental matters (including, without limitation, with respect to any non-compliance under any environmental Permits), or (ii) the relevant insurer under the PLL Insurance.

2.12    Sale Motion.    Within two (2) Business Days of the Petition Date, the Seller shall file the Sale Motion with the Bankruptcy Court, which Sale Motion shall be in form and substance subject to the consent of the Purchaser.

2.13    Certain Notices.    Notices were sent to the Employees of Seller in connection with the closure of the Seller's plant on September 4, 2014.


**ARTICLE III**
REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to, and covenants and agrees that:

3.1    Organization and Good Standing.    Purchaser has been duly organized and is existing as a limited liability company in good standing under the laws of the State of Delaware with full limited liability company power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.

3.2    Execution and Delivery.    This Agreement has been duly authorized by all necessary corporate action on the part of Purchaser, has been duly executed and delivered by

7

Purchaser and without any consent required, constitutes the legal, valid and binding agreement of Purchaser enforceable against Purchaser in accordance with its terms.

     3.3   <u>No Conflicts.</u> The execution, delivery and performance of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby will not conflict with or result in the violation of the provisions of the Organizational Documents of Purchaser.

     3.4   <u>Financing.</u> Purchaser (i) has, or at the Closing will have, sufficient internal funds immediately available to pay any expenses incurred by the Purchaser in connection with the transactions contemplated by this Agreement, (ii) has, or at the Closing will have, the resources and capabilities (financial and otherwise) to perform its obligations hereunder without any consent required, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

     3.5   <u>Brokers, Finders and Investment Banks.</u> Neither the Purchaser, nor any officer, member, director or employee of the Purchaser, nor any Affiliate of the Purchaser, has employed any broker, finder or investment banker or incurred any Liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated hereby.

     3.6   <u>Solvency.</u> Immediately after giving effect to the transactions contemplated by this Agreement, Purchaser shall be able to pay its debts as they become due and shall own property which has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent Liabilities). Immediately after giving effect to the transactions contemplated by this Agreement, Purchaser shall have adequate capital to carry on its business. No transfer of property is being made and no obligations is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Purchaser.

**ARTICLE IV**
**FURTHER COVENANTS AND AGREEMENTS**

4.1   <u>Access to Information.</u>

     (a)   Seller agrees that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 6.4, the Purchaser shall be entitled, through its Affiliates or any of their respective officers, employees, counsel, accountants and other authorized representatives, agents and contractors ("Representatives"), to have such reasonable access to and make such reasonable investigation and examination of the Purchased Assets, books and records, properties, businesses, assets, Employees, accountants, auditors, counsel and operations of Seller (the "Seller's Documents") as the Purchaser's Representatives may reasonably request. Provided, however, that, prior to Closing, the Purchaser will not have the right to perform or conduct any environmental sampling or testing at, in, or underneath any of the Purchased Assets. Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, including Seller's right to have its Representative accompany the Purchaser upon the Real Property at the time of any inspection or examination and shall be subject to

restrictions under applicable Law.  Pursuant to this Section 4.1, Seller shall furnish to the Purchaser and their Representatives such financial, operating and property related data and other information as such Persons reasonably request.  Seller shall use commercially reasonable efforts to cause its Representatives to reasonably cooperate with the Purchaser and the Purchaser's Representatives in connection with such investigations and examinations, and the Purchaser shall, and use its commercially reasonable efforts to cause their Representatives to, reasonably cooperate with Seller and its Representatives and shall use its reasonable efforts to minimize any disruption to the operations of the Seller.

Unless otherwise expressly provided for in this Agreement, the parties acknowledge and agree that there is no due diligence condition to the Purchaser's obligations to close the transactions contemplated by this Agreement.  For greater certainty, after Closing, to the extent that the Purchaser has acquired the Purchased Assets, the Purchaser will have the right, at its discretion, to perform or conduct any environmental sampling or testing at, in, or underneath any of the Purchased Assets.

(b)    All information provided to the Purchaser pursuant to this Section 4.1, shall be considered confidential (the "Confidential Information") and the Purchaser agrees that the Confidential Information will be used solely for the purpose of the transactions contemplated hereby and that all of the Confidential Information will be kept confidential; provided that any such information may be disclosed only to the limited group of the Purchaser's officers, directors, employees, agents, prospective lenders, prospective investors and outside advisors, who are actually engaged in and need to know the Confidential Information for the purpose of consummating this Agreement, who have been informed of the confidential nature of the Confidential Information, and who have been advised by and agree with Purchaser that such information is to be kept confidential and shall not be used for any purpose other than consummating this Agreement, except as required for filings with the Bankruptcy Court. The Purchaser's obligation of confidentiality hereunder shall expire at the Closing, in the event the Closing occurs pursuant to this Agreement, but shall continue in full force and effect for two years from the Execution Date should the Prevailing Bidder not be the Purchaser.

(c)    The Purchaser and Seller agree that they shall each preserve and keep the records held by it relating to the Purchased Assets for a period of three (3) years from the Closing Date, or such longer period as may be required under applicable Laws, and shall, at the sole cost and expense of the requesting party, make such records available after receiving reasonable notice and during regular business hours as may be reasonably required by the requesting party (or its officers, directors or affiliates) or any successor to the requesting party including but not limited to any Chapter 7 or 11 trustee, liquidating trustee or official committee of unsecured creditors in connection with, among other things, any insurance claims, legal proceedings (including without limitation the Chapter 11 Case or any subsequent Chapter 7 case of Seller), tax issues, or governmental investigations, or in order to enable the Seller to comply with its obligations (including any administrative obligations relating to the Chapter 11 Case or any subsequent Chapter 7 case and wind-down the Seller's estate) under this Agreement and each other agreement, document or instrument contemplated hereby or thereby, in each case, (a) at the requesting party's sole cost and expense, (b) in accordance with Law, (c) under the supervision of the providing party's personnel, and (d) in such manner as to maintain confidentiality and not to interfere with the normal operations of the businesses of the providing party.  Each party has no obligation to make available any records if making such records available would (x)

9

jeopardize any attorney-client or other legal privilege or (y) potentially cause such party to be found in contravention of any applicable Law or contravene any fiduciary duty or agreement (including any confidentiality agreement to which either party is a party), it being understood that each party shall cooperate in any reasonable efforts and requests for waivers that would enable otherwise required disclosure to occur without so jeopardizing privilege or contravening such Law, duty or agreement. In the event either party wishes to destroy such records before that time, it shall first give thirty (30) days prior written notice to the other party or any successor including but not limited to any Chapter 11 or 7 trustee, liquidating trustee or official committee of unsecured creditors, and such other party which shall have the right at its option and expense, upon prior written notice given to the party holding such records within such thirty (30) day period, to take possession of the records within thirty (30) days after the date of such notice. Seller or its manager may maintain copies of books and records relating to the Purchased Assets for the purpose of administering and winding down the estate and determining or defending any claims against the Seller, its officers and manager and entities related to any of them, if such claims are related to the Seller or its operations. Notwithstanding anything herein, the parties, with respect to the records, shall comply with bankruptcy court orders on the subject as long as they receive notice and have an opportunity to object to the relief sought. Purchaser shall allow for a period of three (3) months following the Closing Date access to the administrative offices for up to four personnel to conduct the orderly winding down of the Seller's affairs. These personnel will be allowed to occupy the administrative offices to access historical records and computer equipment so long as it does not interfere with the Purchaser's operations and that given access to the computer equipment does not contravene to Law or contract requirement. Seller will advance any out-of-pocket costs to be incurred by the Purchaser as a result of this accommodation.

(d)     Notwithstanding paragraph (b) above, if Purchaser or any of its Representatives becomes legally compelled (whether by law, rule, regulation, subpoena or similar court or other lawful process) to disclose any of the Confidential Information, Purchaser shall, to the extent legally permitted to do so, promptly provide the Seller with written notice of such requirement before any disclosure so that the Seller may (at the Seller's cost and with Purchaser's commercially reasonable efforts in cooperation) seek a protective order or other appropriate remedy and/or, in Seller's sole discretion, waive compliance with the terms of this Agreement to the extent necessary to permit such disclosure.     Notwithstanding the precedent sentence and paragraph (b) above, if Purchaser determines with any applicable U.S., Canadian or provincial securities laws or regulations or applicable listing standards that disclosure of any of the Confidential Information is required or preferable, Purchaser will, to the extent legally permitted to do so, provide advance notice thereof to Seller.

(e)     Confidential Information shall not include information that (i) is or becomes generally available to the public or generally known in the Parties' industry other than as a result of disclosure thereof by the Purchaser that would constitute a breach of this Agreement for information defined as Confidential Information, (ii) becomes available to the Purchaser on a non-confidential basis from a source (other than the Seller) which is to Purchaser's knowledge after reasonable inquiry not prohibited from disclosing such Confidential Information to Purchaser by a legal, contractual, or fiduciary obligation to the Seller, (iii) was within the possession of Purchaser prior to its being furnished by or on behalf of the Seller pursuant to this Agreement, or (iv) is independently developed by Purchaser without reference to Confidential Information.

10

4.2    <u>Further Assurances.</u> Subject to the terms and conditions of this Agreement and applicable Law, Seller and the Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable in compliance with the applicable Laws to consummate and make effective the transactions contemplated by this Agreement as soon as reasonably practicable, and shall coordinate and cooperate with each other in exchanging information, keeping the other party reasonably informed with respect to the status of the matters contemplated by this Section and supplying such assistance as may be reasonably requested by the other party in connection with the matters contemplated by this Section 4.2. Without limiting the foregoing, following the Execution Date and until the earlier to occur of (i) the date on which this Agreement is terminated in accordance with Section 6.4, and (ii) the Closing Date, the parties shall use their commercially reasonable efforts to take the following actions but solely to the extent that such actions relate to the transactions contemplated by this Agreement:

(a)    obtain any required consents, approvals (including Regulatory Approvals), waivers, Permits, authorizations, registrations, qualifications or other permissions or actions by, and give all necessary notices to, and make all filings with, and applications and submissions to, any Governmental Body or third party and provide all such information concerning such party as may be necessary or reasonably requested in connection with the foregoing, and the Seller shall cooperate with the Purchaser in the Purchaser's efforts to accomplish the foregoing, including without limit by assigning to the Purchaser at Closing all of the Seller's rights to governmental Permits which i) are not needed for the wind down of the Seller's business and assets, and ii) can be assigned under applicable Law, however the Seller will provide no assurance that such transfers will be successful or effective, and the Seller shall not be required to incur out of pocket expenditures, except for professional fees and expenses that are consistent with the budget attached to the order authorizing debtor in possession financing or use of cash collateral, as the same may be increased from time to time. Provided, however, that nothing herein shall require the Seller to pay any assignment fees and/or cure amounts or to participate in litigation regarding any such transfers.

(b)    avoid the entry of, or have vacated or terminated, any injunction, decree, order, or judgment that would effectively restrain, prevent, or delay the consummation of the transactions contemplated hereby;

(c)    take any and all reasonably necessary steps to avoid or eliminate every impediment under any applicable Law that is asserted by any Governmental Body with respect to the transactions contemplated hereby so as to enable the consummation of such transactions to occur as expeditiously as possible, provided, however, that there shall be no out of pocket expenditures required of the Seller except for professional fees and expenses that are consistent with the budget attached to the order authorizing debtor in possession financing or use of cash collateral; and

(d)    execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to the Purchaser or its successors and assigns, all of the Purchased Assets, and to otherwise make effective the transactions contemplated hereby and thereby.

Until the earlier to occur of (x) the date on which this Agreement is terminated in accordance with Section 6.4, and (y) the Closing Date, the Seller shall be required to take all actions required and provide sufficient resources (human and financial): (i) to comply with all of its covenants and obligations set forth in this Agreement, (ii) to reasonably cooperate with the Purchaser to obtain any necessary consents, approvals and Permits (including the Excluded Permits), (iii) to satisfy or waive all of the conditions set forth in Article V below, (iv) to promptly respond to the due diligence requests of the Purchaser, and (v) to take such actions before the Bankruptcy Court to allow the Parties to proceed to the Closing, provided, however, that there shall be no out of pocket expenditures required of the Seller except for professional fees and expenses that are consistent with the budget attached to the order authorizing debtor in possession financing or use of cash collateral.

4.3       Notification of Certain Matters. To the extent a Party becomes aware thereof, Seller shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to Seller, of (i) any notice or other communication from any Person alleging that the consent of such Person which is required in connection with the transactions contemplated by this Agreement is not likely to be obtained prior to Closing, (ii) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of any order by the Bankruptcy Court related thereto, and (iii) any other offers or counteroffers submitted for the Purchased Assets. To the extent permitted by applicable Law, Seller shall give prompt notice to the Purchaser of (i) any notice of any alleged violation of Law applicable to Seller, and (ii) the commencement of any investigation, inquiry or review by any Governmental Body with respect to the Purchased Assets.

4.4       Amendment. This Agreement may be amended at any time by a written instrument executed by Purchaser and Seller. Any amendment effected pursuant to this Section 4.4 shall be binding upon all parties hereto, subject to any required Bankruptcy Court approval.

4.5       Waiver. Any term or provision of this Agreement may be waived in writing at any time by the party or parties entitled to the benefits thereof. Any waiver affected pursuant to this Section 4.5 shall be binding upon all parties hereto. No failure to exercise and no delay in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude the exercise of any other right, power or privilege. No waiver of any breach of any covenant or agreement hereunder shall be deemed a waiver of any preceding or subsequent breach of the same or any other covenant or agreement. The rights and remedies of each party under this Agreement are in addition to all other rights and remedies, at law or in equity that such party may have against the other parties.

4.6       Union Matters. The Purchaser recognizes having been informed that the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and the IUOE (the "Unions") are currently the bargaining representatives for Employees working at the Seller's plant. After Closing, should (i) Resolute wish to hire employees for the plant and (ii) a majority of the representative complement of the employees being considered to work at the plant comes from the Unions bargaining unit, Purchaser will recognize the Unions as the bargaining representatives for such employees and will negotiate with the Union the terms and conditions of a new bargaining agreement.

4.7       Seller's Employees. All Employees of Seller working at Seller's plant forming part of the Purchased Assets will have been terminated and severed by Seller, without any Liabilities

whatsoever for Purchaser; provided, however, the Seller shall be entitled to retain any of its employees necessary for the administration of its estate, with no liability to Purchaser.

**ARTICLE V**
CONDITIONS TO CLOSING AND MISCELLANEOUS SALE MATTERS

5.1     Conditions Precedent to the Obligations of the Purchaser and Seller. The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller and Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any statute, rule, regulation, executive order enacted, issued, entered or promulgated by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the Bankruptcy Court shall have entered the Bidding Procedures Order (approving, *inter alia,* the Bid Protections, including approving Purchaser as the Stalking Horse Purchaser as defined in the Bidding Procedures Order), and shall have entered the Sale Order (all as provided in Article VII), which orders shall not have been reversed or stayed; and

(c)     other than with respect to the transfer of any Permits (including the Excluded Permits), any Governmental Body whose consent is required for consummation of the transactions contemplated hereby shall have issued all consents required for the transactions contemplated hereby, without any unreasonable condition or limitation.

5.2     Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Seller in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of the Purchaser set forth in Article III hereof shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct as of such date as though made on and as of such date) except where the failure of such representations or warranties to be true and correct (without giving effect to any limitation or qualification as to "material," "materiality" or "material adverse effect" set forth in such representations and warranties) has not had and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchaser's ability to consummate the transactions contemplated hereby, and Seller shall have received a certificate, substantially in the form attached hereto as **Exhibit A**, signed by an authorized officer of the Purchaser, dated the Closing Date, to the foregoing effect; provided, however, that the person signing the certificate shall have no personal liability on account of the certificate;

(b)     the Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or

complied with by the Purchaser on or prior to the Closing Date; and Seller shall have received a certificate, substantially in the form attached hereto as **Exhibit A**, signed by an authorized officer of the Purchaser, dated as of the Closing Date, to the foregoing effect; provided, however, that the person signing the certificate shall have no personal liability on account of the certificate;

(c)     the Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 6.3; and

(d)     the Purchaser shall have delivered to Seller appropriate evidence of all necessary limited liability company action by the Purchaser in connection with the transactions contemplated hereby, including, without limitation: (i) certified copies of resolutions duly adopted by the Purchaser's members or managers approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by the Purchaser of this Agreement; and (ii) a certificate as to the incumbency of officers of the Purchaser executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

5.3     <u>Conditions Precedent to the Obligations of the Purchaser.</u> The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     Seller shall have delivered to the Purchaser (i) a certified copy of the Sale Order, (ii) copies of all affidavits of service of the Sale Motion and notice of such motion filed by or on behalf of Seller, (iii) copies of all other documents signed by the Seller that are required by this Agreement or which are reasonably requested by Purchaser to aid in the consummation of the transactions contemplated herein;

(b)     Service of the Sale Motion, the Sale Order, and all other papers and notices contemplated by the Bidding Procedures Order shall have been made by Seller in accordance with the Bidding Procedures Order and Federal Rules of Bankruptcy Procedure 2002 and 6004;

(c)     The Bankruptcy Court shall have entered the Bidding Procedures Order and approved the Bid Protections on or before nineteen (19) days from the commencement of the Chapter 11 Case.

(d)     The Bankruptcy Court shall have entered the Sale Order (as provided in Article VII) on or before forty-five (45) days from the commencement of the Chapter 11 Case which order shall not have been stayed;

(e)     The representations and warranties of the Seller set forth in Article II hereof shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct as of such date as though made on and as of such date) except where the failure of such representations or warranties to be true and correct (without giving effect to any limitation or qualification as to "material," "materiality," "Material Adverse Effect" or "material adverse effect" set forth in such representations

14

and warranties) has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and Purchaser shall have received a certificate, substantially in the form attached hereto as **Exhibit B**, signed by an authorized officer of the Seller, dated as of the Closing Date, to the foregoing effect; provided, however, that the person signing the certificate shall have no personal liability on account of the certificate;

(f)     Seller shall have performed and complied in all material respects with all covenants, obligations and agreements required in this Agreement to be performed or complied with by it on or prior to the Closing Date, and Purchaser shall have received a certificate, substantially in the form attached hereto as **Exhibit B**, signed by an authorized officer of the Seller, dated as of the Closing Date, to the foregoing effect; provided, however, that the person signing the certificate shall have no personal liability on account of the certificate;

(g)     No suits, Actions, or other proceeding shall be pending or threatened at Closing which could materially interfere with the consummation of the transaction contemplated herein;

(h)     [Reserved];

(i)     The Purchaser shall have obtained confirmation that the Permits identified in **Schedule 5.3(i)** will be assigned or transferred in its name or that similar new Permits will be issued to it, in each case (i) without any unreasonable condition or limitation in Purchaser's reasonable discretion, and (ii) at Closing or immediately after Closing.

(j)     the Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 6.2; and

(k)     The Seller shall have delivered to Purchaser appropriate evidence of all necessary limited liability company action by the Seller in connection with the transactions contemplated hereby, including, without limitation: (i) certified copies of resolutions duly adopted by the Seller's members or managers approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by the Seller of this Agreement; and (ii) a certificate as to the incumbency of officers of the Seller executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

5.4     Survival of Representations and Warranties. None of the representations, warranties, and to the extent required to be performed or fulfilled prior to the Closing, covenants and agreements of Seller or Purchaser in this Agreement, or in any instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants and agreements, shall survive the Closing Date; provided, however that notwithstanding anything in this Agreement to the contrary, any representation or warranty in the case of fraud or intentional misrepresentation shall survive for a period of sixty (60) days after the Closing Date with respect to either party, but no individual shall have personal liability with respect thereto.

5.5     Further Assurances; Documents Delivered after Closing. From time to time, after

the Closing, at the request of the Purchaser, Seller will execute and deliver to Purchaser such other instruments of conveyance and transfer, and take such other action, as Purchaser may reasonably require to more effectively convey, transfer to, and vest in Purchaser, and to put Purchaser in possession of, any of the Purchased Assets to be conveyed, transferred, and delivered to Purchaser hereunder.

## ARTICLE VI
### CLOSING AND TERMINATION

6.1     <u>Closing.</u>  Subject to the satisfaction of the conditions set forth in Sections 5.1, 5.2 and 5.3 hereof or the waiver thereof by the party entitled to waive the applicable condition, the closing of the purchase and sale of the Purchased Assets and the consummation of the other transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of the Seller's attorneys, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston Massachusetts (or at such other place as the parties may designate in writing) one Business Day after the entry of the Sale Order entered by the Bankruptcy Court approving the transaction contemplated hereunder, unless another time or date, or both, are agreed to in writing by the Parties; provided, however, that the Parties agree to use their respective best efforts to have the Closing on or before December 24, 2014.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of the Seller in the Purchased Assets to be acquired by the Purchaser hereunder shall be considered to have passed to the Purchaser as of 12:01 a.m. Eastern Time on the Closing Date.

6.2     <u>Closing Deliveries by Seller.</u>  At or before the Closing, Seller shall deliver to the Purchaser:

(a)     duly executed bills of sale, deeds, and other documents and instruments with respect to the Purchased Assets necessary to effectuate the transfer thereof, substantially in the forms attached hereto as **Exhibit C** or as otherwise mutually agreed between the parties in their reasonable discretion, including, without limitation, quit claim deeds (as customary in the applicable jurisdiction) with respect to each parcel of Real Property included within the Purchased Assets (along with such certifications of Seller and other documents to be executed and delivered on behalf of Seller that are normal and customary or required in the closing of real estate transactions in the applicable jurisdiction, including such certificates or documents that are reasonably required to be delivered to Purchaser's title insurance company) in form and substance reasonably satisfactory to Purchaser;

(b)     a true and correct copy of the Sale Order entered by the Bankruptcy Court;

(c)     the officer's certificates required to be delivered pursuant to Sections 5.3(e) and 5.3(f); and

(d)     conclusive evidence that Purchaser has been named as a named insured under the PLL Insurance.

6.3     <u>Closing Deliveries by the Purchaser.</u> At or before the Closing, the Purchaser shall deliver to (or at the direction of) Seller:

(a)    the Closing Date Payment; and

(b)    the officer's certificates required to be delivered pursuant to Sections 5.2(a) and 5.2(b).

6.4    Termination of Agreement. This Agreement may be terminated as follows at any time prior to the completion of the Closing:

(a)    by the mutual written consent of Seller and the Purchaser;

(b)    by either the Purchaser or Seller, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect an order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c)    by the Purchaser, if the Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code;

(d)    by the Purchaser, if the Bankruptcy Court has not entered an order approving the DIP Motion/Cash Collateral Motion on an interim basis (the "Interim Order") within ten (10) days of the Petition Date and on a final basis within thirty -five (35) days of the entry of the Interim Order, and the Seller has no other ability to meet its financial obligations under this Agreement; provided that in all cases any such ability of Seller to meet its financial obligations shall have been approved by the Bankruptcy Court;

(e)    by the Purchaser, if the Bankruptcy Court grants to any secured creditor of the Seller relief from the automatic stay to foreclose on or enforce its rights against any of the Purchased Assets;

(f)    by either the Purchaser or Seller, if (i) Seller has consummated an Alternative Transaction or (ii) the Bankruptcy Court has entered an order approving the sale of any or all of the Purchased Assets to a Person other than the Purchaser as either the Prevailing Bidder or the Back-Up Bidder;

(g)    by Seller, if the Purchaser has breached, in a manner that constitutes or causes a Material Adverse Effect, any representation, warranty, covenant or agreement contained in this Agreement, and as a result of such breach the conditions set forth in Section 5.2 hereof would not then be satisfied at the time of such breach; provided, however, that if such breach is curable by the Purchaser within ten (10) days through the exercise of its reasonable best efforts, then for so long as the Purchaser continues to exercise such reasonable best efforts Seller may not terminate this Agreement under this Section 6.4(e) unless such breach is not cured within ten (10) days from written notice to the Purchaser of such breach; provided, further, that Seller is not then in material breach of the terms of this Agreement, and provided further, that no cure period shall be required for a breach which by its nature cannot be cured;

(h)    by Purchaser, if Seller has breached, in a manner that constitutes or causes a Material Adverse Effect, any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in

17

Section 5.3 hereof would not then be satisfied at the time of such breach; provided, however, that if such breach is curable by Seller within ten (10) days through the exercise of its reasonable best efforts, then for so long as Seller continues to exercise such reasonable best efforts the Purchaser may not terminate this Agreement under this Section 6.4(f) unless such breach is not cured within ten (10) days from written notice to Seller of such breach provided, further, that Purchaser is not then in material breach of the terms of this Agreement, and provided further, that no cure period shall be required for a breach which by its nature cannot be cured;

(i)     by Purchaser, if any of the conditions set forth in Section 5.1 or 5.3 become incapable of satisfaction;

(j)     by Seller, if any of the conditions set forth in Section 5.2 become incapable of satisfaction;

(k)     by Seller, if any of the conditions set forth in Section 5.1 become incapable of satisfaction;

(l)     by Purchaser if the Bankruptcy Court has not entered the Bidding Procedures Order and approved the Bid Protections before the close of business on the tenth (10th) business day after the Petition Date;

(m)     by either Seller or Purchaser if the Closing shall not have occurred on or before the earlier of (i) the close of business on January 15, 2015 or (ii) the termination or expiration of the Seller's DIP credit facility, or such later date as the parties may mutually agree; provided, however, that the party terminating the Agreement is not then in material breach of any of the terms of this Agreement.

6.5     <u>Procedure Upon Termination.</u> In the event of a termination of this Agreement by the Purchaser or Seller or both, (a) written notice thereof shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, (b) this Agreement shall thereupon terminate and become void and of no further force and effect, except as provided in Section 6.6, and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto. If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

6.6     <u>Effect of Termination.</u> Except as provided in this Section 6.6, in the event of the termination of this Agreement pursuant to Section 6.4, this Agreement (other than Section 1.7, Section 6.5, this Section 6.6, and Article VIII, and all provisions dealing with the disposition of deposits and escrows or the payment to the Purchaser of the Bid Protections, which shall survive such termination) will forthwith become void, and there will be no liability on the part of the Purchaser, on the one hand, or the Seller, on the other hand, or any of their respective officers or directors (as the case may be), to the other parties, and all rights and obligations of any party hereto will cease.  For avoidance of any doubt, any termination of the Agreement shall be subject to the terms and conditions of Section 1.7.

The parties acknowledge and agree that if this Agreement is terminated by the Purchaser as contemplated by Section 6.4, the actual damages incurred by the Purchaser will be difficult, if

not impossible, to ascertain and accordingly, the parties have provided for the liquidated damages provided above. This provision shall not be construed as a penalty, but as a bona fide attempt to establish an agreed upon measure of damages which the Purchaser will suffer as a result of such termination of this Agreement. As provided in the Bidding Procedures Order, the Bid Protections shall be treated as a super-priority administrative expense claim in the Chapter 11 Case and shall be paid to the Purchaser prior to the payment of the proceeds of any sale to any third party asserting an Encumbrance on the Purchased Assets (and no Encumbrance of any third party shall attach to the portion of the sale proceeds representing the Bid Protections).

In the event that (a) this Agreement is validly terminated pursuant to Section 6.4 (other than Section 6.4(g)), (b) the Purchaser would be entitled to receive the Bid Protections pursuant to this Agreement upon the closing of the sale contemplated herein to the Prevailing Bidder or Back Up Bidder, (c) a closing to the Prevailing Bidder or Back Up Bidder does not occur, and (d) Seller consummates an Alternative Transaction (including a plan of reorganization, recapitalization transaction, merger, consolidation, business combination or similar transaction, or acquisition of the equity interests in the Seller) for consideration greater than the purchase price determined after the auction, where the counterparty is a Person (or group of Persons) other than the Purchaser or an Affiliate of the Purchaser within one year after the date of any such termination, or if the Seller enters into a definitive agreement within such one year period with respect to such a sale that is subsequently consummated within nine (9) months of the Seller's entry into any such agreement, the Purchaser shall receive from the Seller out of the closing proceeds of such sale at the closing of such sale in an amount equal to <u>the lesser of</u> (i) the Bid Protections or (ii) <u>the greater of</u> (A) the amount by which the value of the Alternative Transaction exceeds the Cash Price hereunder or (B) the actual and documented out-of-pocket fees and expenses, including fees and expenses of legal advisors, financial advisors and accountants, incurred by the Purchaser in connection with this Agreement, the Chapter 11 Case, the Bid Procedures and the transactions contemplated hereby and thereby in an amount not to exceed $150,000.

## ARTICLE VII
### BANKRUPTCY COURT MATTERS

7.1    <u>Competing Bids and Other Matters.</u>

(a)    This Agreement and the transactions contemplated hereby are subject to Seller's right and ability to consider higher or better competing bids with respect to any or all of the Purchased Assets pursuant to the Bidding Procedures Order. As set forth in Section 7.1(b), the Seller may solicit and negotiate higher and/or otherwise better offers from any Person deemed appropriate by the Seller (an "Alternative Transaction").

(b)    From the Execution Date until the Bid Deadline (as defined in the Bidding Procedures Order), Seller shall have the responsibility and obligation to solicit and respond to any reasonable inquiries or offers to purchase all or any part of the Purchased Assets, and perform any and all other acts related thereto, including, without limitation, supplying information relating to the business operations and the assets of Seller to prospective purchasers, subject only to the provisions of the Bidding Procedures Order and subject to execution of an appropriate confidentiality agreement by any potential purchaser prior to its receiving such information. Notwithstanding the foregoing, at any time after the Execution Date through the entry of the Bidding Procedures Order, Seller will not accept any

competing offers to become the Stalking Horse Purchaser (as defined in the Bidding Procedures Order).

7.2  Bid Protections. Purchaser shall be considered the "Stalking Horse Purchaser" as defined in the Bidding Procedures Order, and the Parties agree and acknowledge that the Bankruptcy Court's approval of Purchaser as the Stalking Horse Purchaser is a material term of this Agreement.  The Seller shall immediately pay Purchaser (a) a break-up fee in the amount of $170,000 (the "Break Up Fee") plus (b) the actual and documented out-of-pocket fees and expenses, including fees and expenses of legal advisors, financial advisors and accountants, incurred by the Purchaser in connection with this Agreement, the Chapter 11 Case, the Bid Procedures and the transactions contemplated hereby and thereby in an amount not to exceed $150,000 (the "Expense Reimbursement", and together with the Break Up Fee, the "Bid Protections") in the event that the Purchaser is not the Prevailing Bidder (the bidder deemed by the Seller and approved by the Bankruptcy Court as the highest and best bidder), and the sale of all or substantially all of the Purchased Assets to the Prevailing Bidder or a Back-up Bidder (as defined in the Bidding Procedures Order) is closed.  The Bid Protections shall be paid from the payment received by the Prevailing Bidder or Back-up Bidder on account of the sale of the Purchased Assets in an Alternate Transaction.   For the avoidance of doubt, if the Bid Protections becomes due pursuant to the terms of this Agreement and the Bidding Procedures Order, such fees and expenses shall only be paid once. Further for the avoidance of doubt, notwithstanding anything to the contrary herein, the Bid Protections shall not become due, nor shall they be payable by the Seller or any other party, unless (x) the Bid Protections is approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, and (y) the conditions for payment of the Bid Protections pursuant to this Section 7.2 are met.  Upon receipt of the Bid Protections, Purchaser shall make no other claims for expense reimbursement from the Seller.  Following the Execution Date, Seller shall promptly seek the Bankruptcy Court's approval of the Bid Protections.

7.3  Sale Order. In the event an Auction is conducted and the Purchaser is the Prevailing Bidder, or in the event no Auction is conducted pursuant to the Bidding Procedures Order, an order shall be entered by the Bankruptcy Court substantially in the form attached hereto as **Exhibit D**  and otherwise in form and substance acceptable to Seller and the Purchaser (the "Sale Order"). The Sale Order shall, among other things, (i) approve, pursuant to Sections 105(a) and 363 of the Bankruptcy Code: (A) the execution, delivery and performance by Seller of this Agreement, (B) the sale of the Purchased Assets to the Purchaser on the terms set forth herein and free and clear of all Liens, Claims, Liabilities and Encumbrances (other than the Permitted Encumbrances), and (C) the performance by Seller of its obligations under this Agreement; (ii) find that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to the Seller, and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code; (iii) provide that the Sale Order is binding on any successor chapter 11 or chapter 7 trustee and (iv) provide that any stay of the Sale Order pursuant to Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) is waived and such order shall be final upon entry.  Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of demonstrating that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. The Bankruptcy Court shall maintain jurisdiction over the interpretation and enforcement of its order.

7.4     <u>Notice and Reasonable Efforts</u>.  The Seller shall provide appropriate notice of the hearings on the Sale Motion and the Auction, as is required by the Bankruptcy Code and the Bankruptcy Rules, to all parties entitled to notice, including, but not limited to, all taxing and environmental authorities in jurisdictions applicable to Seller.  Thereafter, the Seller shall take all actions as may be reasonably necessary to cause each of such Orders to be issued, entered and become a Final Order.

7.5     <u>Defense of Orders</u>.  If the Bidding Procedures Order, the Sale Order, or any other order of the Bankruptcy Court relating to this Agreement (collectively, the "<u>Bankruptcy Orders</u>") shall be appealed (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), the Seller shall take reasonable steps as may be appropriate to defend against such appeal, petition or motion, and the Purchaser agrees to cooperate in such efforts, and each of the Seller and the Purchaser hereto shall endeavor to obtain an expedited resolution of such appeal.

## ARTICLE VIII
## MISCELLANEOUS

8.1 <u>Notices</u>.    Unless required otherwise in this Agreement,  all notices and other communications under or in connection with this Agreement shall be in writing and shall be deemed given (a) if delivered personally (including by overnight express or messenger), upon delivery, (b) if delivered by registered or certified mail (return receipt requested), upon the earlier of actual delivery or three days after being mailed, (c) if given by facsimile, upon confirmation of transmission by facsimile, in each case to the parties at the following addresses:

If to the Purchaser:

Resolute FP Illinois LLC (c/o Resolute Forest Products)
111 Duke Street, Suite 5000
Montreal QC
Canada H3C 2M1

Attention: Jo-Ann Longworth, SVP and CFO

With a copy to:

Resolute FP Illinois LLC (c/o Resolute Forest Products)
111 Duke Street, Suite 5000
Montreal QC
Canada H3C 2M1

Attention: Jacques P. Vachon, SVP Corporate Affairs and CLO

If to the Seller:

Alsip Acquisition, LLC
c/o Alsip Holdings, LLC
13101 S Pulaski Road
Alsip, IL 60803

With copies to:

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Facsimile: (617) 542-2241
Attention: Richard E. Mikels, Esq.

and

Riemer Braunstein LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, New York 10036
Attention: Steven E. Fox, Esq.

8.2    Severability. If any term or provision of this Agreement or the application thereof to any circumstance shall, in any jurisdiction to any extent, be invalid or unenforceable, such term or provision shall be ineffective as to such jurisdiction to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable such term or provision in any other jurisdiction, and the remaining terms and provisions of this Agreement or the application of such terms and provisions to circumstances other than those as to which such terms and provisions are held invalid or enforceable shall remain in full force and effect.

8.3    Entire Agreement. This Agreement, including the annexes and schedules attached hereto and other documents referred to herein and incident to this transaction, contains the entire understanding of the parties hereto in respect of its subject matter and supersedes all prior and contemporaneous agreements and understandings, oral and written, between the parties with respect to such subject matter.

8.4    Successors and Assigns. This Agreement shall be binding upon the Seller and Purchaser and shall inure to the benefit of the parties and their respective successors and permitted assigns, including, without limitation, any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as otherwise provided in this Section 8.4. No assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or the Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void, except that the Purchaser may assign such rights and obligations to an Affiliate of the Purchaser so long as Purchaser remains responsible for its obligations hereunder. This Agreement is not intended to benefit, and shall not run to the benefit of or be enforceable by, any other person or entity other than the parties hereto and their permitted successors and assigns.

8.5    <u>Counterparts; Facsimile Signatures.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same Agreement. This Agreement, any and all agreements and instruments executed and delivered in accordance herewith, along with any amendments hereto or thereto, to the extent signed and delivered by means of E-mail, a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

8.6    <u>Recitals, Schedules and Annexes.</u> The recitals, schedules and annexes to this Agreement are incorporated herein and, by this reference, made a part hereof as if fully set forth at length herein.

8.7 <u>Construction.</u>

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    All references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed to refer to Articles, Sections, Schedules and Exhibits to this Agreement.

(ii)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

(v)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi)    Any reference in this Agreement to $ shall mean U.S. dollars.

(vii)    Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)    The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)    The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

(c)    Purchaser acknowledges hereby that Seller may not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

8.8    Governing Law. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF DELAWARE SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

8.9    Jurisdiction, Waiver of Jury Trial.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE PARTIES CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN DELAWARE OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY, UNLESS EACH OF THE COURTS OF THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN DELAWARE DO NOT HAVE JURISDICTION OR ARE UNWILLING OR UNABLE TO HEAR SUCH DISPUTE.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.10    Injunctive Relief. The Parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, except as expressly provided herein each Party shall be entitled to injunctive relief with respect to any such breach of the other Parties, including without limitation, specific performance of such covenants, promises or agreements or an order enjoining such other Parties from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 8.10 shall be in addition to any other rights which each Party may have at Law or in equity pursuant to this Agreement.

8.11 <u>Expenses.</u> Except as otherwise set forth in this Agreement, each of Seller and Purchaser shall each bear its own expenses (including attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

8.12 <u>Non-Recourse.</u> Except as expressly contemplated by this Agreement, no past, present or future director, officer, employee, incorporator, member, partner or equity holder of the Seller or Purchaser shall have any liability for any Liabilities of the Seller or Purchaser of or for any Claim based on, in respect of, or by reason of, the transactions contemplated by this Agreement.

8.13 <u>Time of the Essence.</u> Time is of the essence in the performance of each of the obligations of the Parties and with respect to all covenants and conditions to be satisfied by the Parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

8.14 <u>Headings; Currency.</u> The table of contents and the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All amounts stated herein are in United States dollars unless expressly indicated otherwise.

8.15 <u>Definitions.</u>

"<u>Action</u>" means any Claim, demand, action, cause of action, chose in action, right of recovery, right of set-off, suit, arbitration, inquiry, proceeding, or investigation, including any of the foregoing before any Governmental Body;

"<u>Affiliate</u>" of any Person shall mean any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with the former Person (or in the case of the Purchaser, any Affiliate of such Affiliate), where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble.

"<u>Alternative Transaction</u>" shall have the meaning set forth in Section 7.1.

"<u>Auction</u>" shall have the meaning set forth in the Bidding Procedures Order.

"<u>Back-up Bidder</u>" shall have the meaning set forth in the Bidding Procedures Order.

"<u>Bankruptcy Code</u>" shall have the meaning set forth in the Recitals. "Bankruptcy Court" shall have the meaning set forth in the Recitals.

"<u>Bidding Procedures Order</u>" shall mean that certain *Order (A) Establishing Bidding Procedures in Connection with Sale of Substantially All of the Assets of the Debtor, Including Certain Bidding Incentives, (B) Approving the Form and Manner of Notices, (C) Setting a Sale*

*Hearing, and (D) Granting Related Relief"* in substantially the form annexed hereto as **Exhibit D**.

"Bid Protections" shall have the meaning set forth in Section 7.2.

"Break Up Fee" shall have the meaning set forth in Section 7.2.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in Wilmington, Delaware are authorized or required by Law to be closed.

"Cash Price" shall have the meaning set forth in Section 1.6.

"Chapter 11 Case" shall have the meaning set forth in the Recitals.

"Claim" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, inter alia, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations and Liabilities of any kind or nature under contract or tort, at law or in equity, known or unknown, contingent or material, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" and "Closing Date" have the respective meanings assigned to such terms in Section 6.1.

"Closing Date Payment" shall have the meaning set forth in Section 1.7.

"Confidential Information" shall have the meaning set forth in Section 4.1(b).

"Contract" shall mean any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, license, commitment or instrument or other agreement, arrangement or commitment that is binding upon a Person or its property.

"Deposit" shall have the meaning set forth in Section 1.7.

"Documents" shall mean all of Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Employee" shall mean an individual who is, or has been, employed by Seller.

"Encumbrance" shall mean any encumbrance, Lien, Claim, Liability, interest, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defects, claims of ownership or similar claims, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

"Escrow Agent" shall have the meaning set forth in Section 1.7.

"Excluded Assets" shall have the meaning set forth in Section 1.1(b)

"Excluded Liabilities" shall have the meaning set forth in Section 1.3.

"Excluded Permits" shall mean the Company's MWRDGC Discharge Authorization, MWRDGC Canal Inlet Easement and Title V Air –Illinois EPA.

"Execution Date" shall mean the date upon which this document is executed by the Seller and the Purchaser.

"GAAP" means United States generally accepted accounting principles as in effect from time to time and consistently applied in the financial statements of Seller.

"Governmental Body" shall mean any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"Income Tax" shall mean all Taxes based upon, measured by, or calculated with respect to gross or net income or gross or net receipts or profits, including any interest, penalty or addition thereto.

"Knowledge of Seller" or other words of similar meaning shall mean and include all facts and other matters that any of Seller's President and CEO as of the date of execution of this Agreement or Seller's CRO as of the date of execution of this Agreement actually know, after reasonable inquiry.

"Laws" shall mean all federal, state, local or foreign laws, statutes, common laws, rules, codes, regulations, guidance, policies, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies, or court of competent jurisdiction, or other requirement or rule of law.

"Legal Requirement" shall mean any statute, law, ordinance, rule, regulation, Permit, order, writ, judgment, injunction, decree or award issued, enacted or promulgated by any Governmental Body or any arbitrator.

"Liability" means any debt, liability, Claim, commitment or obligation of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising, including, without limitation, whether arising out of any contract, tort based on negligence, strict liability or otherwise.

"Lien" has the meaning given that term in Section 101(37) of the Bankruptcy Code and includes, inter alia, all liens (including judgment and mechanics' liens, regardless of whether liquidated), mortgages, assessments, security interests, easements, Claims, pledges, trusts (constructive or other), deeds of trust, options or other charges, Encumbrances or restrictions.

"Material Adverse Effect" shall mean, as asserted by the Purchaser, any event, change, occurrence, fact, condition or effect (an "Event"), other than the filing of the Chapter 11 Case and the plant closure by the Seller on September 4, 2014, that has or would reasonably be expected to have, either directly or indirectly, individually or in the aggregate with any other event, change, occurrence, fact, condition or effect, a materially adverse effect on, the Purchased Assets. Such Event shall only constitute a Material Adverse Effect if the anticipated use, value and enjoyment of the results of the transaction contemplated in this Agreement is significantly reduced or delayed from what the Purchaser anticipated in a manner that could cause significant capital or business related expenditure or rehabilitation costs. Without limiting the generality of the foregoing, an Event raised by Purchaser, at its discretion, shall be deemed to constitute a Material Adverse Effect if the Purchaser could be required to incur obligations of $1,500,000 or more in connection therewith (including, without limitation, for work, repairs, removal or remedial costs and expenses related to actual or potential environmental Liabilities).

"Ordinary Course of Business" shall mean the ordinary and usual course of normal day-to-day operations of the Seller's Business consistent with past practice.

"Organizational Documents" shall mean (a) with respect to a corporation, the certificate or articles of incorporation and bylaws; (b) with respect to a limited liability company, the certificate of formation and the limited liability company agreement, (c) with respect to any other entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of such entity; and (d) any amendments to any of the foregoing.

"Party" or "Parties" shall mean the Seller and/or the Purchaser, as applicable.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates necessary for the operation and use of the Purchased Assets in the Ordinary Course of Business.

"Permitted Encumbrances" shall mean (i) easements, rights of way, restrictive covenants, encroachments and similar non-monetary Encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the value of the Purchased Assets and, in case of Real Property, which do not, individually or in the aggregate adversely affect the use or occupancy of such Real Property or materially detract from the value of the Real Property, (ii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which do not, individually or in the aggregate

adversely affect the value of the Purchased Assets, and, in the case of Real Property, which do not, individually or in the aggregate, adversely affect the use of occupancy of such Real Property or materially detracts from the value of the Real Property, (iii) such other Encumbrances or title exceptions or which do not, individually or in the aggregate, adversely affect the ownership or use of the Purchased Assets or adversely affect the value of the Purchased Assets.

"Person" shall mean all natural persons, corporations, business trusts, associations, companies, partnerships, joint ventures, Governmental Bodies and any other entities.

"Petition Date" shall mean the date on which the Seller files its petition initiating the Chapter 11 Case.

"PLL Insurance" shall mean (i) the Pollution Legal Liability Select Policy, including all notices and endorsements, issued to Alsip Acquisition, LLC by Lexington Insurance Company (Policy No. PLS13405132) and (ii) the Pollution and Remediation Legal Liability Policy, including all notices and endorsements, issued to Alsip Acquisition, LLC by XL Americas, Inc. (Policy No. PEC003916401).

"Prevailing Bidder" shall have the meaning set forth in the Bidding Procedures Order.

"Purchase Price" shall have the meaning set forth in Section 1.6.

"Purchased Assets" shall have the meaning set forth in Section 1.1(a).

"Purchaser" shall have the meaning set forth in the Introduction.

"Real Property" means all of the real property owned, used or occupied by Seller, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights, privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use by Seller.

"Regulatory Approvals" shall mean any consents, waivers, approvals, orders, Permits or authorizations of any Governmental Body required in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereunder.

"Representatives" shall have the meaning set forth in Section 4.1(a).

"Sale Hearing" shall have the meaning set forth in the Bidding Procedures Order.

"Sale Motion" shall mean that certain "Debtor's Motion for Entry of an Order: ( )(A) Establishing Bidding Procedures in Connection with Sale of Substantially All of the Assets of the Debtor, Including Certain Bidding Incentives, (B) Approving the Form and Manner of Notices, (C) Setting a Sale Hearing, and (D) Granting Related Relief; (II) Approving the Sale of Substantially all of the Assets of the Debtor Free and Clear of Liens, Claims and Encumbrances

to the Successful Bidder" to be filed by Seller in the Bankruptcy Court, including all Exhibits thereto and papers filed in support thereof, seeking approval and entry of the Sale Order.

"Sale Order" shall have the meaning set forth in Section 7.3.

"Seller" shall have the meaning set forth in the Introduction.

"Seller's Business" shall mean the business of operating a coated paper mill and de-inking plant in which the Seller was engaged prior to the Petition Date.

"Seller's Documents" shall have the meaning set forth in Section 4.1(a).

"Tax" and "Taxes" shall mean any and all taxes, charges, fees, tariffs, duties, impositions, levies or other assessments, imposed by any Governmental Body, and include any interest, penalties or additional amounts attributable to, or imposed upon, or with respect to, Taxes.

"Tax Return" shall mean any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

[Signature page follows.]

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement, or has caused this Agreement to be executed on its behalf by a representative duly authorized, all as of the date first above set forth, and with liability attaching only to the parties and not to the persons executing this Agreement as their representatives.

PURCHASER:

RESOLUTE FP ILLINOIS LLC
A Delaware limited liability company

By: _____
Name: Jo-Ann Longworth, SVP & CFO
Title:

By: _____
Name: Jacques P. Vachon
Title: SVP Corporate Affairs & CLO

SELLER:

ALSIP ACQUISITION, LLC,
A Delaware limited liability company

By: _____
Name: Stephen L. Silver
Title:   President

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement, or has caused this Agreement to be executed on its behalf by a representative duly authorized, all as of the date first above set forth, and with liability attaching only to the parties and not to the persons executing this Agreement as their representatives.

PURCHASER:


RESOLUTE FP ILLINOIS LLC
A Delaware limited liability company


By: _____
Name:
Title:

By: _____
Name:
Title:


SELLER:

ALSIP ACQUISITION, LLC,
A Delaware limited liability company

By: _____
Name: Stephen L. Silver
Title:  President