## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ALSIP ACQUISITION, LLC, et al.,[1] | ) | Case No. 14-12596 (KJC) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Alsip Acquisition, LLC and APCA, LLC, the above-captioned debtors and debtors in possession (each a "Debtor" and together the "Debtors") file this motion (this "Motion")[2] for entry of an interim order (the "Interim DIP Order"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"), (a) authorizing the Debtors to obtain postpetition secured financing pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and in accordance with Rules 2002, 4001, and 9014, of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2002-1(b) and 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (b) granting liens and super-priority claims with respect to such postpetition financing, (c) authorizing the Debtor to use Cash

---

[1]  The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Alsip Acquisition, LLC (Tax ID No. XX-XXX4908), and APCA, LLC (Tax ID No. XX-XXX3005).

[2]  Unless otherwise noted herein, all capitalized terms used in this Motion shall have the meanings ascribed to such terms herein, regardless of whether the definitions of such terms appear later in this Motion than the first use of such term. Capitalized terms used in this Motion but not otherwise defined herein shall have the meanings ascribed to them in the Interim DIP Order or the DIP Financing Agreements, as applicable.

Collateral, on an interim basis, pending a final hearing on this Motion, (d) approving the form of adequate protection to be provided by the Debtors to the Prepetition Lender, (e) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Interim DIP Order, (f) prescribing the form and manner of notice and setting the time for the final hearing on this Motion (the "Final Hearing") to consider entry of the Final DIP Order, and (g) granting related relief. In further support of this Motion, the Debtors respectfully state as follows.[3]

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

---

[3] The facts and circumstances supporting this Motion are set forth in the *Declaration of Stephen L. Silver in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

**Preliminary Statement**

4.      The Debtors require immediate access to liquidity to ensure that they are able to preserve the value of the estates pending the proposed sale of their assets.  To that end, the Debtors have secured an approximately $3,000,000 DIP Facility to ensure that overall enterprise value can be preserved.  Among other things, the DIP Facility proceeds will be used to honor employee wages and benefits, procure services integral to the Debtors' ongoing sale of its inventory, fund certain related expenses as set forth in the Budget, and satisfy administrative expenses incurred during these chapter 11 cases pending the consummation of the proposed sale of assets.

5.      The DIP Facility represents the best source of appropriately-sized financing available to the Debtors under the circumstances, and was negotiated vigorously at arm's length over the course of several weeks, resulting in terms that the Debtors submit are reasonable and appropriate to meet the Debtors' financing needs during these chapter 11 cases.  The DIP Facility is an essential component of the Debtors' plan to sell their assets to the highest and best bidder at an auction.  Through this process, the Debtors have successfully negotiated a financing that generally provides:

- an approximately $3,000,000 line of credit secured by consensual, first priority priming liens on substantially all the Debtors' assets, subject only to liens that were senior to the liens of the Prepetition Lender as of the Petition Date;

- borrowings and disbursements to be made pursuant to the terms of an agreed 13-week budget, a copy of which is attached as **Exhibit 2** to the Interim DIP Order (as the same may be modified in accordance with the DIP Financing Agreements, the "Budget"); and

- a scheduled maturity date of the earlier of (i) December 31, 2014, and (ii) the closing of the sale of all or substantially all of the assets of the Debtors, with additional, customary termination events.

3

6.      Absent interim approval of the DIP Facility, there is a significant risk that the Debtors would be forced to close their doors immediately and abort their plan to sell their assets, thereby threatening the Debtors' estates, their creditors and especially the Debtors' employees (current and former) many of whom may hope to obtain employment at the plant if a sale transaction can close with a strategic buyer.  The Debtors have extremely limited cash on hand and do not expect to generate sufficient levels of cash flow through the continued sale of its inventory during the chapter 11 cases.  The DIP Facility is necessary in order for the Debtors to remain viable through the closing of a sale transaction.  In addition, and as discussed more fully below, substantially all the Debtors' assets are encumbered by liens arising under its prepetition lending facility, and the Debtors believe the Prepetition Lender is materially undersecured.  As a result, the Debtors do not believe third-party debtor-in-possession financing would be reasonably available and has determined that the proposed DIP Facility provides the best path forward under the circumstances to address the immediate liquidity needs, fund the chapter 11 cases, and provide a clear path toward a sale of the assets.

## Terms and Conditions of the DIP Facility

### I.      Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2

7.      The following chart contains a summary of the essential terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2.4.[4]

---

[4]  The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined shall have the meanings ascribed to them in the DIP Documents or the Interim DIP Order, as applicable.

4

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Alsip Acquisition, LLC and APCA, LLC<br><br>*See* Ratification Agreement at p. 1; Interim DIP Order, Preamble. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Watermill – Alsip Enterprises, LLC (pursuant to a limited guaranty that is secured by $2,250,000 of cash collateral held by the Prepetition Lender)<br><br>*See* Ratification Agreement, §2.2. |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Wells Fargo Bank, National Association<br><br>*See* Ratification Agreement at p. 1; Interim DIP Order at p. 2, Section I (I) |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The DIP Facility shall include loans to be advanced and made available to the Debtors in the aggregate maximum principal amount of approximately $3,000,000.<br><br>*See* Interim DIP Order p. 2, Section I, ¶ 3. |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br>Local 4001-2(a)(ii) | The term of the DIP Facility shall mature at the earliest to occur of (i) December 31, 2014, (ii) failure to obtain the Interim DIP order on or before ten (10) days after the Petition Date; (iii) failure to obtain the Final Order on or before thirty (30) days after the date the Interim DIP Order is entered; and (iv) closing of the sale of all or substantially all of the Debtors.   In addition, the DIP Facility requires the Borrowers to consummate a Substantial Asset Disposition on terms and conditions acceptable to the Lender in its sole discretion on or before December 30, 2014.<br><br>*See* Ratification Agreement, §§ 1.2(f), 3.5(b); Interim DIP order, ¶ 28. |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br>Local Rule 4001-2(a)(ii) | The DIP Facility shall be used (i) to pay the necessary and reasonable expenses actually incurred in connection with the liquidation of the Collateral and the administration of the chapter 11 cases, subject to the Budget, (ii) for other proper corporate purposes, and (iii) to fund the Prepetition Indemnity Account.<br><br>*See* Ratification Agreement, §3.3(b); Interim DIP Order ¶¶ 4, 9.<br><br>In addition, the Borrowers shall pay over to Lender all proceeds realized upon the collection, sale, transfer, conveyance and/or assignment of any and all Pre-Petition Collateral and Post-Petition Collateral for application to, reduction of, and payment, <u>first</u>, in payment and reduction of the Post-Petition Obligations, and <u>second</u>, for application to, reduction of, and |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | payment of the Pre-Petition Obligations, as applicable; provided that, upon the consummation of a Substantial Asset Disposition (whether pursuant to the Stalking Horse Agreement or such other Substantial Asset Disposition Agreement as shall be selected by the Borrowers) in accordance with the Substantial Asset Disposition Bidding Procedures and the Financing Orders, as applicable, **(i)** the amount of any Bid Protections required to be paid to the Stalking Horse, if any, shall be paid first from the proceeds realized upon a closing of such Substantial Asset Disposition before application to, reduction of, and payment of the Pre-Petition Obligations and Post-Petition Obligations, respectively, as applicable, and **(ii)** the amount of fees and expenses of the Case Professionals accrued in accordance with the Budget and that remain unpaid through the date of such closing, plus the amounts set forth in paragraph 24(e) and (f) shall be set aside in a segregated account to be held by the Borrower until the allowance by the Bankruptcy Court of such fees and expenses, and such set aside shall be paid first (*pari passu* with the payment of any Bid Protections) from the proceeds realized upon a closing of such Substantial Asset Disposition before application to, reduction of, and payment of the Pre-Petition Obligations and Post-Petition Obligations, respectively, as applicable. Any amounts remaining in the set aside account after payment in full of all allowed fees and expenses of Case Professionals shall be used for application to, reduction of, and payment of the Pre-Petition Obligations and Post-Petition Obligations, respectively, as applicable. <br><br> *See* Ratification Agreement, §4.2; Interim DIP Order ¶14(c)(iii). |
| **Entities with Interests in Cash Collateral** <br> Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition Lender. <br><br> *See* Interim DIP Order, p. 2, Section II (A), p. 5, Section II, E(5). |
| **Fees** <br> Bankruptcy Rule 4001(c)(1)(B) <br> Local Rule 4001-2(a)(ii) | DIP Lender shall earn a commitment fee in the amount of $100,000 upon entry of the Interim DIP Order. <br><br> *See* Ratification Agreement, §§ 1.1(d) and 4.8. |
| **Interest Rates** <br> Bankruptcy Rule 4001(c)(1)(B) <br> Local Rule 4001-2(a)(ii) | Daily Three Month LIBOR plus the Applicable Margin, with a floor of 5.0 percent (plus an additional 4.0 percent upon default). <br><br> *See* Pre-Petition Credit Agreement, Section 1.7(a), (c). |

DOCS_DE:196308.3 02980/001

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The obligation of the DIP Lender to make advances is subject to customary borrowing and cash collateral use conditions, as well as compliance with the Substantial Asset Disposition Schedule, which sets the schedule by which (i) a motion to sell the assets must be filed, (ii) bidding procedures must be approved, (iii) the auction must be completed, (iv) a sale hearing must be held, and (v) the sale must be consummated. *See* Ratification Agreement, Article 5. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) Local Rule 4001-2(a)(ii) | The use of cash collateral and proceeds from the DIP Facility is subject to a customary budget, attached to the Interim DIP Order as Exhibit 1. *See* Interim DIP Order, Exhibit 1. |
| **Reporting Information** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(ii) | Standard reporting requirements that largely conform to the Debtors' prepetition reporting obligations under the Pre-Petition Credit Agreement, including a weekly variance report setting forth actual cash receipts, disbursements and loan balances of the Debtors for the prior week and setting forth all the variances, on a cumulative weekly roll-forward basis as compared to the Budget. *See* Ratification Agreement, §3.2(b). |
| **Variance Covenant** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(ii) | The Debtors shall not permit (i) for any weekly period, the actual receipts and collections during such weekly period to be less than ninety percent (90%) of the projected weekly receipts set forth on the Initial Budget for such weekly period, (ii) for any weekly period, the actual weekly disbursements during such weekly period to exceed one hundred and ten percent (110%) of the projected weekly disbursements set forth in the Initial Budget for such weekly period, or (iii) during the period covered by the Initial Budget, (x) the aggregate actual receipts to be less than ninety percent (90%) of the aggregate projected receipts set forth on the Initial Budget for such period, and/or (y) the aggregate actual disbursements to exceed one hundred and ten percent (110%) of the aggregate projected disbursements set forth on the Initial Budget for such period (any failure to comply with the limitations contained in either subsection (i) and/or (ii) constituting a "Material Budget Deviation"). Line item receipts from accounts receivable collections and disbursement amounts budgeted for one weekly period may be carried over into subsequent weekly periods to account for timing differences, but any such budgeted line item disbursement amounts may not be pre-funded or accelerated without Lender's prior written consent. Weekly/cumulative budget variance allowances shall not apply with respect to any professional fee line item |

7

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | appearing in the Initial Budget (or any subsequent budget) without Lender's prior written consent.<br><br>*See* Ratification Agreement, §3.2(c). |
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The Debtors shall achieve each of the following milestones:<br><br>(i) the Interim DIP Order shall be entered no later than five (5) days after the Petition Date; (ii) the Substantial Asset Disposition Motion shall be filed with the Court no later than two (2) business days after the Petition Date; (iii) the Final DIP Order shall be entered not later than thirty (30) days after the Petition Date; (iv) the order approving the Substantial Asset Disposition Bidding Procedures shall be entered by the Court not later than fifteen (15) days after the Petition Date; (v) Debtors shall have completed an auction of qualified bidders for the Substantial Asset Disposition not later than thirty (30) days after the Petition Date; (vi) the Court shall have conducted the hearing on the Substantial Asset Disposition Motion not later than thirty-five (35) days after the Petition Date; and (vii) the Substantial Asset Sale shall be consummated not later than forty (40) days after the Petition Date.<br><br>*See* Ratification Agreement, §1.1(w); Interim DIP Order, ¶ 28(b). |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i)<br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | Subject and subordinate to the Carve Out and the Bid Protections, in all respects, all obligations of the Debtors under the DIP Facility shall be (i) pursuant to section 364(c)(1) of the Bankruptcy Code, afforded superpriority allowed administrative expense claim status in these chapter 11 cases; (ii) secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority lien on all of the Debtors' assets; and (iii) secured, pursuant to section 364(d) of the Bankruptcy Code, a first priority, senior priming lien on and security interest in all of the Debtors' assets (subject to Permitted Prior Liens).<br><br>*See* Interim DIP Order ¶ 7. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(f) | The claims and liens granted to the Prepetition Lender and DIP Lender under the DIP Financing Agreements shall each be subject to:<br><br>(a)      allowed administrative expenses in respect of fees required to be paid to the Clerk of the Bankruptcy Court;<br><br>(b)      all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) plus interest, if any, pursuant to 31 U.S.C. § 3717;<br><br>(c)      all actually accrued and unpaid expenditures for reasonable fees, |

8

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | disbursements, costs and expenses incurred by professional persons or firms retained by the Debtors pursuant to Final Order of the Court (each a "<u>Debtor Professional</u>" and collectively the "<u>Debtor Professionals</u>" (the "<u>Debtor Professional Fees</u>"), to the extent allowed at any time by Final Order of the Bankruptcy Court, prior to the date of service by the Lender of a Carve Out Trigger Notice (defined below), in each case not in excess of the respective Initial Budget amounts for each Debtor Professional or category of Debtor Professional through the date of service of said Carve Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice, *less* the amount of unapplied pre-petition retainers held by such Debtor Professionals;<br><br>(d)    subject to such limitations as appear in the Interim Budget, all actually accrued and unpaid expenditures for fees, disbursements, costs and expenses incurred by professional persons or firms retained by the Committee (the "<u>Committee Professional Fees</u>") pursuant to Final Order of the Court (each a "<u>Committee Professional</u>" and collectively the "<u>Committee Professionals</u>"; and collectively with the Debtor Professionals the "<u>Case Professionals</u>"), to the extent allowed at any time by Final Order of the Bankruptcy Court, prior to the date of service by the Lender of a Carve Out Trigger Notice, in each case, not in excess of the respective Budget amounts for each Committee Professional or category of Committee Professional through the date of service of said Carve Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice, *less* the amount of unapplied pre-petition retainers held by such Committee Professionals;<br><br>(e)    subject to such limitations as appear in the Interim Budget for Debtor Professional Fees, an amount equal to the allowed amount of any "Success Fee" earned by Sanabe & Associates, LLC, if any, under that certain engagement agreement dated as of November __, 2014; <u>provided that</u>, any such amount shall be paid from the proceeds of the sale of the Debtors' assets pursuant to a Substantial Asset Disposition consummated in accordance with the Substantial Asset Disposition Bidding Procedures;<br><br>(f)    all accrued and unpaid Debtor Professional Fees incurred from and after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time by Final Order of the Bankruptcy Court, in an aggregate amount not to exceed $50,000, less the amount of unapplied pre-petition retainers held by such Debtor Professionals and not applied to the Debtor Professional Fees set forth in clause (c) above; and<br><br>(g)    all accrued and unpaid Committee Professionals Fees incurred from and after the date of service of a Carve Out Trigger Notice, to the |

9

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | extent allowed at any time by Final Order of the Bankruptcy Court, in an aggregate amount not to exceed $25,000, less the amount of unapplied pre-petition retainers held by such Committee Professionals and not applied to the Committee Professional Fees set forth in clause (d) above.<br><br>Following the Petition Date, the Debtor Professional Fees and the Committee Professional Fees shall be paid first from retainers held by such professionals, and such payment from retainers shall reduce dollar for dollar the Carve-Out Cap (as defined below) applicable to such Case Professional(s). For the avoidance of doubt, the Carve-Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals. For purposes of the foregoing, the term "Carve-Out Cap" means, in the aggregate, the amounts set forth in clauses (c) through and including (f) above, and the term "Carve Out Trigger Notice" shall mean a written notice delivered by the Lender to the Debtors and their counsel, counsel to the Prepetition Lender, the United States Trustee, and counsel to any Committee, which notice may be delivered at any time following the occurrence and continuance of any DIP Order Event of Default.<br><br>*See* Interim DIP Order ¶¶ 24-27. |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br>Local Rule 4001-2(a)(i)(C) | Subject to the entry of the Final DIP Order, no expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law.<br><br>*See* Interim DIP Order ¶¶ L, 37, 38. |
| **Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(i)(h) | Subject to the entry of the Final DIP Order, no expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the Collateral under section 552(b) of the Bankruptcy Code.<br><br>*See* Interim DIP Order ¶¶ L, 48. |

10

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Stipulations to Prepetition Liens and Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) Local Rule 4001-2(a)(i)(B) | The Debtors stipulate and acknowledge (i) to the amount, validity, priority, and enforceability of the Obligations under the Pre-Petition Secured Facilities, and (ii) that the Pre-Petition Secured Parties have a valid, enforceable and fully perfected first priority liens in all of the Prepetition Collateral, including the Cash Collateral. *See* Interim DIP Order ¶ E(1)-(6). |
| **Adequate Protection** Bankruptcy Rule 4001(b)(l)(B)(iv),4001 (c)(1)(B)(ii) | Subject in all respects to the Carve Out and the DIP Liens, the Prepetition Lender shall receive the following as adequate protection: (i)   a valid and perfected postpetition replacement security interests in and liens upon the DIP Petition Collateral (the "Adequate Protection Liens"), which liens shall be subject and subordinate to (a) the Carve Out, (b) the DIP Liens, and (c) any Permitted Prior Liens; (ii) a superpriority claim under section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or after arising, subject and subordinate to the payment of the (a) the DIP Liens, (b) the DIP Superpriority Claim, and (c) the Carve Out) *provided, however,* that the Adequate Protection Superpriority Claim shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries; (iii) the Debtors are authorized and directed to pay on an ongoing basis, from time to time after the Petition Date, the current payment of the reasonable documented out-of-pocket costs and expenses of its financial advisors and attorneys, cash interest at the rates as provided in the Prepetition Financing Agreements, proceeds of the Substantial Asset Disposition; and (iv) upon entry of the Final Order, the Debtors shall establish an account in the control of the Prepetition Lender (the "Prepetition Indemnity Account"), into which the sum of $150,000 of Cash Collateral shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor of the Prepetition Lender under the Pre-Petition Credit Agreement. *See* Interim DIP Order ¶14(f). |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(ii) | Events of Default.   Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest, and fees, defaults under affirmative and negative covenants and breaches of representations and warranties.  The DIP Financing Agreements contains case milestones, the failure of which to satisfy would constitute an Event of Default thereunder.  Additionally, certain actions, if taken, or pleadings, if filed, would constitute an Event of Default. Remedies.   After the occurrence of any Event of Default under the DIP |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Financing Agreements, the DIP Lender may accelerate the DIP Obligations without further order of the Court, and (ii)(A) after the occurrence of any DIP Order Event of Default or (B) at any time thereafter during the continuance of such DIP Order Event of Default, upon five (5) days' prior written notice of such occurrence, the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Financing Agreements.<br><br>Upon the occurrence of an Event of Default under the DIP Financing Agreements, and provided that such Event of Default is still continuing: (a)the Debtors shall continue to deliver and cause the delivery of the proceeds of DIP Collateral to the DIP Lender as provided in the DIP Financing Agreements and this Interim Order; (b) the DIP Lender shall continue to apply such proceeds in accordance with the provisions of the DIP Financing Agreements and this Interim Order; (c) the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the DIP Obligations and the Carve Out; and (d) any obligation otherwise imposed on the DIP Lender to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended.<br><br>Following the giving of written notice by the DIP Lender of the occurrence of a DIP Order Event of Default, the Debtors and any Committee(s) appointed in the Chapter 11 Cases, if any, shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether a DIP Order Event of Default has occurred. If the Debtors or any such Committee(s) do not contest the occurrence of a DIP Order Event of Default and therefore the right of the DIP Lender to exercise its remedies, or if the Debtors or any such Committee(s) do timely contest the occurrence of a DIP Order Event of Default and the Court after notice and hearing declines to stay the enforcement thereof, the automatic stay as to the DIP Lender shall automatically terminate at the end of such five (5) day notice period.<br><br>*See* Interim Order, ¶¶ 30, 31 |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362(a) of the Bankruptcy Code are modified pursuant to the terms of the DIP Financing Agreements as necessary to permit the Debtors to grant the Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Lender under the DIP Financing Agreements, the DIP Facility, and this Interim Order, and authorize the DIP Lender and the Prepetition Lender to retain and apply payments hereunder as provided by |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | the DIP Financing Agreements and the Interim Order.<br><br>Any automatic stay otherwise applicable to the DIP Lender is modified so that (i) after the occurrence of any Event of Default under the DIP Financing Agreements, the DIP Lender may accelerate the DIP Obligations without further order of the Court, and (ii)(A) after the occurrence of any DIP Order Event of Default or (B) at any time thereafter during the continuance of such DIP Order Event of Default, upon five (5) days' prior written notice of such occurrence, the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Financing Agreements. In any hearing regarding the exercise of rights or remedies by the DIP Lender, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing.<br><br>*See* Interim DIP Order ¶¶ 12, 31. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Replacement Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens and the Adequate Protection Replacement Liens or to entitle the DIP Liens and the Adequate Protection Replacement Liens to the priorities granted in the Interim Order.<br><br>The DIP Lender may, in its discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents, and all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.<br><br>The DIP Lender, in its discretion, may file a photocopy of the Interim Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of the Interim Order. |

13

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | *See* Interim DIP Order ¶ 16-19. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Subject to the "Challenge Period Rights" set forth in the Financing Orders, the Debtors hereby release, waive, and forever relinquish all claims, demands, obligations, liabilities and causes of action of whatever kind or nature, whether known or unknown, which it/they has, may have, or right assert now or in the future against the Prepetition Lender and/or its parent, affiliates, participants, officers, directors, employees, agents, attorneys, accountants, consultants, successors and assigns, directly or indirectly, arising out of, based upon, or in any manner connected with (i) any transaction, event, circumstance, action, failure to act or occurrence of any sort or type, whether known or unknown, which occurred, existed, was taken, permitted or begun prior to the execution of the Ratification Agreement with respect to the Obligations (as defined in the Ratification Agreement), the Financing Agreements (as defined in the Ratification Agreement) and/or the administration thereof or the obligations created thereby; (ii) any discussions, commitments, negotiations, conversations or communications with respect to the refinancing, restructuring or collection of any Obligations; or (iii) anything or matter related to any of the foregoing. <br><br>*See* Ratification Agreement, §6.1. |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(l)(B)(xi) Local Rule 4001-2(a)(i)(D) | The DIP Lender shall have a lien on any claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof. <br><br>*See* Interim DIP Order ¶ 6(c). |
| **Challenge Period** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(i)(B) | In the case of (i) the Committee, if appointed, within sixty (60) days of the formation of the Committee, or (ii) all other parties in interest, within seventy-five (75) days of the entry of the Interim DIP Order, is the time by which the Committee or party in interest (in any case, which has obtained the requisite standing) is required to commence a proceeding against the Prepetition Secured Parties to assert claims in connection with any matter related to the Prepetition Credit Agreements or the Prepetition Collateral (a "Challenge Proceeding"). <br><br>If no such Challenge Proceeding is timely commenced, then all challenges and objections to the Prepetition Obligation and Lien should be forever waived and barred and the Prepetition Debt shall be deemed to be allowed in full and shall be deemed to be allowed as a fully secured claim within |

14

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Chapter 11 Cases and the Debtors' Stipulations shall be binding on all creditors, interest holders, and parties-in-interest.<br><br>*See* Interim DIP Order ¶ 22. |
| **No Priming or Pari Passu Liens**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | There shall not be entered in the Chapter 11 Cases, or in any Successor Cases, any order which authorizes any of the following:<br><br>(a)    Any modification, stay, vacation or amendment to the DIP Orders to which the DIP Lender has not consented;<br><br>(b)    A priority claim or administrative expense or unsecured claim against the Debtors (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the DIP Lender in respect of the DIP Obligations, except with respect to the Carve Out;<br><br>(c)    Any Lien on any DIP Collateral having a priority equal or superior to the Lien securing the DIP Obligations, except (a) with respect to the Carve Out, or (b) for the Permitted Prior Liens;<br><br>(d)    Any order which authorizes the return of any of the Debtors' property pursuant to section 546(h) of the Bankruptcy Code; or<br><br>(e)    Any order which authorizes the payment of any Indebtedness (other than those under the Prepetition Financing Agreements, Indebtedness reflected in the Initial Budget, and other Indebtedness approved by the DIP Lender, in each case incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien other than as set forth in the DIP Orders).<br><br>*See* Interim DIP Order ¶ 40. |

## Relief Requested

8.    The Debtors seek entry of the Interim DIP Order and, pending the Final Hearing, the Final DIP Order, in each case:

a.     Authorizing the Debtors to enter into a senior secured, first-priority DIP facility
       (the "DIP Facility"), which shall include loans (the "DIP Loans") to be advanced
       and made available to the Debtors in the aggregate principal amount of
       approximately $3,000,000 with up to $831,462.50 to be available upon entry of
       the Interim DIP Order and satisfaction of other conditions to borrowing, pursuant
       to the terms and conditions of that certain (x) Ratification and Amendment
       Agreement, dated as of November 20, 2014 (the "Ratification Agreement"), and
       (y) Credit and Security Agreement, dated April 16, 2010 (as may be amended,
       modified or supplemented and in effect from time to time (the "Pre-Petition
       Credit Agreement" and collectively, the "DIP Financing Agreements") by and
       between the Debtors as, as borrowers, and Wells Fargo Bank, National
       Association (in its capacity as lender under the Pre-Petition Credit Agreement, the
       "Prepetition Lender") and in its capacity as lender under the DIP Financing
       Agreements, the "DIP Lender"), a copy of which is attached hereto as **Exhibit B**.

b.     ordering that, subject to the Carve Out and Bid Protections, in all respects, all
       obligations of the Debtors under the DIP Financing Agreements (collectively, the
       "DIP Obligations") shall be:

       (i)     entitled to superpriority claim status under section 364(c)(1) of the
               Bankruptcy Code (the "DIP Superpriority Claim") with priority over all
               administrative expense claims and unsecured claims now existing or
               hereafter arising under the Bankruptcy Code;

       (ii)    secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid,
               enforceable, first priority, fully perfected security interests and liens
               upon all of the Debtors' rights in property of the Debtors' estate as of the
               Petition Date, and all of the Debtors' rights in property acquired
               postpetition, including any claims and causes of action to which the
               Debtors may be entitled to assert by reason of any avoidance or other
               power vested in or on behalf of the Debtors or the estates of the Debtors
               under Chapter 5 of the Bankruptcy Code and any and all recoveries and
               settlements thereof, whether now existing or hereafter acquired or arising
               (collectively, the "DIP Collateral"), subject and subordinate only to those
               liens that, under applicable law, are senior to, and have not been
               subordinated to, the liens of the Prepetition Lender under the [Pre-Petition
               Credit Agreement], but only to the extent that such liens are valid,
               enforceable, and nonavoidable liens as of the Petition Date and liens
               permitted under the DIP Facility (collectively, "Permitted Prior Liens");
               and

       (iii)   secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first
               priority, perfected lien on all of the Debtors' rights in property of the
               Debtors' estates as of the Petition Date that, as of the Petition Date, were
               unencumbered (the liens granted in subparagraphs (ii) and (iii), the "DIP
               Liens, and, together with the DIP Superpriority Claim, the "DIP
               Protections").

c.    authorizing the Debtors to use all cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all collateral pledged to the DIP Lender and/or the Prepetition Lender, which shall constitute cash collateral, as contemplated by section 363 of the Bankruptcy Code ("Cash Collateral");

d.    ordering that, subject in all respects to the Carve Out and the DIP Liens, the Prepetition Lender shall receive the following as adequate protection (collectively, the "Adequate Protection") to the extent of any diminution in the value of any Prepetition Collateral as a result of (i) the use, sale, or lease of Prepetition Collateral, (ii) the granting of priming liens to secure the DIP Facility, or (iii) the imposition of the automatic stay:

(i)    a valid, enforceable, fully perfected security interest in and postpetition replacement lien on the DIP Collateral, subject and subordinate to (a) the Carve Out, (b) the DIP Liens, and (c) any Permitted Prior Liens;

(ii)    a superpriority claim under section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or hereafter arising, subject and subordinate to the Carve Out, the DIP Liens and the DIP Superpriority Claim;

(iii)    payment to the Prepetition Lender of (a) all fees and expenses payable under the Prepetition Financing Agreements, (b) cash interest at the rates provided in the Pre-Petition Credit Agreement, and (c) payment of the proceeds of the Substantial Asset Disposition;

(iv)    upon entry of the Final Order, the establishment of the Prepetition Indemnity Account.

e.    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order or the Final DIP Order, as applicable;

f.    scheduling the Final Hearing to consider entry of the Final DIP Order and approving the form of notice with respect to the Final Hearing; and

g.    granting related relief.

### Background

9.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed

17

a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

### The Debtors' Prepetition Capital Structure

10.    As of the Petition Date, the Debtors had approximately $8,039,639.00 of funded indebtedness and related obligations outstanding, pursuant to the Pre-Petition Credit Agreement.

## I.    The Prepetition Loan

11.    The Debtors are the borrowers under the Pre-Petition Credit Agreement, which provides the Debtors with a term loan (the "Term Loan") and a revolving credit facility (the "Revolver" and together with the Term Loan, the "Prepetition Secured Facilities") subject to the terms and conditions set forth therein. The Prepetition Secured Facilities were set to mature on April 14, 2013, subject to certain extensions allowed by its terms. The Debtors use approximately $1 million of the Revolver in the form of letters of credit.

12.    The obligations arising under the Prepetition Secured Facilities are secured by liens on substantially all of the Debtors' assets.

13.    The Pre-Petition Credit Agreement has been amended several times since it closed. On November 29, 2011, recognizing a need for relief from certain defaults under the Pre-Petition Credit Agreement, the Debtors entered into a waiver and tenth amendment thereto (the "Tenth Amendment") to provide for the following terms and conditions, among others:

  a.  a one-time waiver of defaults in respect to compliance with the minimum EBITDA covenant, and maximum Debt to Book Net Worth ratio;

  b.  increasing availability under the Prepetition Secured Facilities from $15 million to $17 million;

  c.  extending the maturity from April, 14, 2013 to April 14, 2014;

18

    d.   increasing the Applicable Margins; and

    e.   requiring a limited guaranty for the repayment of the Prepetition Secured Facilities.

14.    As noted, obligations arising under the Prepetition Secured Facilities are guaranteed on a limited basis by Watermark-Alsip Enterprises, LLC, which limited guaranty is secured by a cash collateral account in the amount of $2,250,000 held by the Prepetition Lender.

15.    On September 5, 2014, in the face of additional defaults under the Pre-Petition Credit Agreement, the Debtors entered into a certain Forbearance Agreement with the Prepetition Lender. The Forbearance Agreement was premised in large part on the fact that the Debtors had commenced a marketing process for the sale of the business and/or assets, and that during such marketing process and thereafter, the Debtors would implement an orderly wind-down plan pending consummation of the sale. The Forbearance Agreement has been subsequently amended and terminates on the earlier to occur of (x) a default thereunder, or (y) November 14, 2014. The Forbearance Agreement contains additional terms and conditions, including, without limitation, the following:

    a.   an acknowledgement of the amount owed under the Prepetition Financing Agreements, as of September 5, 2014, in the amount of approximately $13.9 million, exclusive of fees and costs, without defense, deduction, offset or counterclaim;

    b.   a ratification of the Prepetition Lender's first priority lien position on the Debtors' assets;

    c.   a requirement that the guarantor increase the cash collateral account in the amount of $250,000;

    d.   a wind-down advance from the Prepetition Lender in the amount of $1,125,000 to fund costs and expenses associated with the wind-down of the Debtors' operations; and

    e.   a release from the Debtors in favor of the Prepetition Lender of all claims in connection with the Pre-Petition Credit Agreement and the lending relationship with the Debtors.

19

## The Debtors Have an Immediate Need for Cash

16.     As noted above, the Debtors propose to use the DIP Loans and Cash Collateral to satisfy employee wages, employee benefits, certain other limited operational expenses as set forth in the Budget, and to fund administration of these chapter 11 estates in order to achieve a sale of the assets to a buyer that will preserve jobs in the area.  Without access to the DIP Loans and Cash Collateral to satisfy these obligations, the Debtors will have insufficient funds to pay wages for its employees, preserve and maximize the value of their estates, and administer these chapter 11 cases.  Thus, the Debtors' access to the DIP Loans and Cash Collateral will facilitate its efforts to maximize value for their stakeholders through the proposed sale transaction.  Absent approval of the Interim DIP Order, the Debtors will not have access to the DIP Loans or the Cash Collateral necessary to fund administration of these chapter 11 estates, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders and other parties in interest.

## Alternative Sources of Financing Are Not Readily Available

17.     The Debtors do not believe that alternative sources of financing are available.  Additionally, the Debtors do not believe it would prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis.  As noted above, without access to the DIP Facility, the Debtors have extremely limited cash on hand, and do not expect to be able to generate sufficient levels of cash flow through the continued sale of inventory to cover their cash needs and the projected costs of these chapter 11 cases.  In addition, substantially all of the Debtors' assets are encumbered by liens arising under the Pre-Petition Credit Agreement.  As a result, the Debtors do not believe third-party debtor-in-possession financing would be reasonably available given the realities imposed by the Debtors' existing capital structure.

18.    The Debtors believe that the Prepetition Lender is grossly undersecured in its claim on all of the Debtors' assets. The proposed DIP Facility offered by the Prepetition Lender (*i.e.*, the DIP Lender) allows the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of the chapter 11 cases. Accordingly, the Debtors believe that the DIP Facility represents the best option available to address the immediate liquidity needs. It is the product of extensive arm's length negotiations with the DIP Lender and is an essential component of the broader plan to sell the assets and preserve jobs. Moreover, the DIP Facility represents the only viable financing available that would not require the Debtors to seek to prime the Prepetition Liens on a nonconsensual basis.

### Provisions to be Highlighted Pursuant to Local Rule 4001-2

19.    In accordance with Local Rule 4001-2, the following provisions of the DIP Facility are highlighted below. As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

    a.    **Local Rule 4001-2(a)(i)(B) — *Challenge Period*.** The Interim DIP Order affords the Committee (if any) or any other party in interest an opportunity to assert claims against the Prepetition Lender in connection with matters related to the Pre-Petition Credit Agreement or the Prepetition Collateral by no later than (a) with respect to the Committee, if appointed, sixty (60) days from the date of formation of the Committee, and (b) with respect to all other parties-in-interest, seventy-five (75) days after the entry of the Interim DIP Order. *See* Interim DIP Order ¶ 22.

    b.    **Local Rule 4001-2(a)(i)(C) — *506(c) Waiver*.** Subject to the entry of the Final DIP Order, the Collateral shall not be subject to surcharge pursuant to section 506(c) of the Bankruptcy Code. *See* Interim DIP Order ¶¶ 37-38.

    c.    **Local Rule 4001-2(a)(i)(D) — *Liens on Avoidance Actions*.** DIP Liens will be granted on any claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements. *See* Interim DIP Order ¶ 6(b).

21

d.    **Local Rule 4001-2(a)(i)(F) — *Disparate Carve Out Treatment*.** The Debtor Professionals and the Committee Professionals are afforded a carve out for their respective fees and expenses as provided in the Initial Budget. These amounts, and the amounts of the carve out available for Case Professionals after the issuance of a Carve Out Trigger Notice do provide for different amounts for the Debtor Professionals and the Committee Professionals. *See* Interim DIP Order ¶ 24(c), (d), (f) and (g).

e.    **Local Rule 4001-2(a)(i)(G) — *Nonconsensual Priming*.** The Prepetition Lender has consented to the "self-priming" of the Prepetition Liens and the Adequate Protection Liens. *See* Interim DIP Order, p. 9, ¶ J.

f.    **Local Rule 4001-2(a)(i)(H) — *Section 552(b)(1)*.** The proposed waiver of "equities of the case" claims under section 552(b) of the Bankruptcy Code will only be effective after entry of the Final DIP Order. In connection with committing to provide postpetition financing, lenders commonly request a waiver of the "equities of the case" claims. Here, the DIP Lender is providing the Debtors with critical funds to administer these chapter 11 cases and preserve and maximize the value of their estates and, as a result, are providing a substantial benefit to the Debtors' estates. The Debtors therefore submits that this waiver is appropriate under the circumstances. *See* Interim DIP Order ¶ 48.

**Basis for Relief**

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Financing Agreements**

    A.    **Entering into the DIP Financing Agreements Is an Exercise of the Debtors' Sound Business Judgment**

20.    The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Financing Agreements, obtain access to the DIP Facility, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed]

sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

21.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a Debtors' business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the Debtors'] authority under the [Bankruptcy] Code").

22.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtor offered by a proposed postpetition facility. For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

Although all parties, including the Debtor and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

23.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's length process and careful evaluation of alternatives. Specifically, and in the face of extremely limited cash on hand, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their selves during these chapter 11 cases pending the consummation of the proposed sale of their assets. Accordingly, the Debtors negotiated the DIP Financing Agreements and other DIP Facility with the DIP Lender in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available.

**B.     The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

24.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the

Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

25.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

26.    Based on current capital market conditions, after consultation with their advisors, the Debtors determined that postpetition financing on an unsecured basis would be unobtainable. Without postpetition financing, the Debtors will not be able to preserve and maximize the value of their estates. Absent sufficient financing to operate the businesses during these chapter 11 cases and consummate the proposed restructuring transaction, the value of the Debtors' estates would be significantly impaired to the determent of all stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Financing Agreements, are fair, reasonable, and adequate, all as more fully set forth below.

27.    In the event that a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving the DIP Superiority Claim in favor of the DIP Lender is reasonable and appropriate. Further, section 364(c)(2) of the

25

Bankruptcy Code provides that the debtor may obtain credit that is secured by lien on property of the estate that is not otherwise subject to a lien.  The DIP Liens sought herein are senior only with respect to the Debtors' unencumbered property.  As the Debtors are unable to obtain the critical financing they need to administer their chapter 11 cases from any other source, they respectfully represent that granting DIP Liens to the DIP Lender is warranted under the circumstances.

**C.     The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens**

28.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  S*ee Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Lender has consented or (b) the Prepetition Lender's interests in collateral are adequately protected.

29.     Here, the Debtors seek authority to enter into the DIP Facility, which will provide the DIP Lender priming liens on the collateral currently secured by the existing liens of the Prepetition Lender.  Importantly, the Prepetition Lender has consented to the DIP Facility and

the priming liens granted thereunder.    Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**D.    No Comparable Alternative to the DIP Facility Is Reasonably Available**

30.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).    Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

31.    As noted above, after consulting with their advisors the Debtors do not believe that alternative sources of financing are reasonably available.    Substantially all the Debtors' assets are encumbered by liens arising under its prepetition lending facility, and the Debtors believe the Prepetition Lender is materially undersecured.    As a result, the Debtors do not believe third-party debtor-in-possession financing is reasonably available given the realities imposed by the Debtors' existing capital structure.    Thus, the Debtors have determined that the DIP Facility

provides the best path forward under the circumstances to both fund these chapter 11 cases and provide a clear path toward consummating the proposed sale of assets. Therefore, the Debtors submit that the requirements of sections 364 of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtor is satisfied.

## II.    The Debtors Should Be Authorized to Use the Cash Collateral

32.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party. Here, the Prepetition Lender consents to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.

33.    Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992*); see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

28

34.    As described more fully above and in the Interim DIP Order, the Debtors propose to provide the Prepetition Lender with four primary forms of adequate protection to protect against the postpetition diminution in value of the Cash Collateral in respect of the Carve Out and the DIP Obligations, and resulting from the use, sale, or lease of the Prepetition Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Provisions"):

    a.    Adequate Protection Claim:  a superpriority claim under section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or after arising, subject and subordinate to the payment of the Carve Out, the DIP Liens and the DIP Superpriority Claim;

    b.    Adequate Protection Liens:  a valid, enforceable, fully perfected security interest in and replacement lien on all of the Debtors' assets subject and subordinate to (i) the Carve Out, (ii) the DIP Liens, and (iii) any Permitted Prior Liens;

    c.    Adequate Protection Payments:  payment to the Prepetition Lender of (a) cash interest under the Pre-Petition Credit Agreement, (b) fees and expense of the Prepetition Lender, (c) proceeds from the sale of substantial Asset Disposition; and

    d.    Prepetition Indemnity Agreement: upon entry of the Final Order, establishment of the Prepetition Indemnity Account.

35.    The proposed Adequate Protection Provisions are sufficient to protect the Prepetition Lender from any diminution in value to the Prepetition Collateral.  In light of the foregoing, the Debtors submit, and the Prepetition Lender agrees, that the proposed Adequate Protection Provisions to be provided for the benefit of the Prepetition Lender are appropriate. Thus, the Debtors' provision of the Adequate Protection Provisions is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral,

DOCS_DE:196308.3 02980/001

subject to the terms and limitations set forth in the Interim DIP Order, for the benefit of all

parties in interest and their estates.

**III.     The DIP Lender Should Be Deemed a Good-Faith Lender under Section 364(e)**

36.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364
> of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this
> section of a priority or a lien, does not affect the validity of any debt so incurred,
> or any priority or lien so granted, to an entity that extended such credit in good
> faith, whether or not such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such priority or
> lien, were stayed pending appeal.

37.     As explained herein and in the First Day Declaration, the DIP Facility is the result

of the Debtors' reasonable and informed determination that the DIP Lender offered the most

favorable terms on which to obtain needed postpetition financing, and of arm's length, good-

faith negotiations between the Debtor and the DIP Lender.  The terms and conditions of the DIP

Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP

Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further,

no consideration is being provided to any party to the DIP Facility other than as described herein.

Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the

meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections

afforded by that section.

**IV.     The Automatic Stay Should Be Modified on a Limited Basis**

38.     The proposed Interim DIP Order provides that the automatic stay provisions of

section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any

DOCS_DE:196308.3 02980/001

financing statements, security agreements, notices of Liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim DIP Order. The proposed Interim DIP Order further provides that the automatic stay is modified as necessary to permit the Debtor to grant the DIP Liens to the DIP Lender and to incur all liabilities and obligations set forth in the Interim DIP Order. Finally, the proposed Interim DIP Order provides that, following the occurrence of an Event of Default (as defined in the DIP Credit Agreement), the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies in accordance with the DIP Documents, or applicable law.

39.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g., In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order*); In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.,* No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## V.    Failure to Obtain the Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm

40.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary

31

expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a Debtors' estate.

41.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors from and after entry of the Interim DIP Order until the Final Hearing to receive advances contemplated by the DIP Facility.  The Debtors require these advances prior to the Final Hearing and entry of the Final DIP Order to be able to continue to operate and pay administrative expenses.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Request for Final Hearing

42.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

43.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

44.     The Debtors will provide notice of this Motion to the following parties, or their counsel, if known: (a) Wells Fargo Bank, National Association as the Debtors' secured lender; (b) the United States Trustee for the District of Delaware; (c) the Office of the Attorney General for the State of Illinois; (d) the Department of Revenue for the State of Illinois and the Internal Revenue Service; (e) the Debtors' secured creditors and lessors that have filed financing

DOCS_DE:196308.3 02980/001

statements; (f) the Debtors' twenty-five (25) largest unsecured creditors; (g) the Stalking Horse Bidder; (h) the Unions; and (i) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.

45.      Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that it be authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with the Interim DIP Order, and notice of the Final Hearing, by first class mail upon the parties referenced in the foregoing section above.  The Debtors respectfully request that such notice is sufficient and requests that this Court find that no further notice of the Final Hearing and Final DIP Order is required.

**No Prior Request**

46.      No prior request for the relief sought in this Motion has been made to this or any other court.

DOCS_DE:196308.3 02980/001

**WHEREFORE**, the Debtors respectfully request entry of the Interim DIP Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein, and granting such other relief as is just and proper.

Dated:  November 20, 2014

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Colin R. Robinson (Bar No. 5524)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  ljones@pszjlaw.com
         crobinson@pszjlaw.com
         pkeane@pszjlaw.com

-and-

Richard E. Mikels (BBO No. 345620)
Kevin J. Walsh (BBO No. 629984)
Charles W. Azano (BBO No. 655775)
Mintz, Levin, Cohn, Ferris,
  Glovsky and Popeo P.C.
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 542-6000
Facsimile: (617) 542-2241
E-mail:  rmikels@mintz.com
         kwalsh@mintz.com
         cazano@mintz.com

[Proposed] Counsel for Debtors and Debtors in Possession